**NATIONAL CAPITAL AIRLINES, INC.,**
Petitioner

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

**Washington Airways, Inc., Intervenor.**
No. 22634.

United States Court of Appeals
District of Columbia Circuit.

Argued June 18, 1969.

Decided Sept. 12, 1969.

Petition for Rehearing Denied
October 28, 1969.

**670**

Mr. Julian H. Singman, Washington, D. C., with whom Messrs. B. Michael Rauh and Orlin L. Livdahl, Jr., Washington, D. C., were on the brief, for petitioner.

Mr. Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, Civil Aeronautics Board, with whom Messrs. Joseph B. Goldman, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey, Atty., Civil Aeronautics Board, and Howard E. Shapiro, Atty., Department of Justice, were on the brief, for respondent.

Messrs. Howard C. Westwood, William H. Allen, and Richard D. Copaken, Washington, D. C., were on the brief, for intervenor.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

ROBB, Circuit Judge:

This is a petition [1] by National Capital Airlines (National Capital) to review an order issued by the Civil Aeronautics Board in a proceeding known as the Washington-Baltimore Helicopter Service Investigation. In that proceeding National Capital was an unsuccessful applicant for a certificate of public convenience and necessity,[2] authorizing scheduled helicopter service in the Washington-Baltimore area. The challenged order awarded a certificate for that service to the intervenors, Washington Airways, Inc. (Washington Airways).[3] By the same order the Board approved [4] the ownership and control of Washington Airways by its organizers, nine of the fixed-wing carriers authorized to serve the Washington-Baltimore area.

The petitioner attacks the Board's order on several grounds. First, it contends that the Board abused its discretion by permitting Washington Airways to participate in the proceeding, and that the Board committed other procedural errors to the prejudice of the petitioners. Second, petitioner contends that the Board's approval of ownership and control of Washington Airways by its sponsors is unlawful under the Federal Aviation Act and the anti-trust laws because this joint venture of nine carriers will result in the creation of a monopoly and will restrain competition. Finally, the petitioner argues that the Board's conclusion that Washington Airways is better qualified than National Capital to perform the service certificated is not supported either by substantial evidence or by adequate subsidiary findings. We find the petition-

1. Pursuant to 49 U.S.C. § 1486(a).

2. Under § 401 of the Federal Aviation Act, 49 U.S.C. § 1371.

3. The certificate was a "temporary" one "authorizing the transportation of persons, property, and mail on a subsidy ineligible basis for a period of five years between the terminal point Dulles Inter-

national Airport, the intermediate points Washington National Airport, downtown Washington, D. C., Friendship International Airport, and the terminal point downtown Baltimore, Md."

4. Under §§ 408, 409 and 412 of the Federal Aviation Act, 49 U.S.C. §§ 1378, 1379, 1382.

er's arguments unpersuasive and we affirm.

National Capital is a corporation organized under the sponsorship of San Francisco & Oakland Helicopter Airways (SFO) for the purpose of operating a helicopter service in the Washington-Baltimore area. Forty-nine percent of the issued common stock of National Capital is held by SFO and its president. The remaining shares have been purchased by persons with business or other interests in the Washington-Baltimore area.

Washington Airways is likewise a corporation organized solely to apply for a certificate in the Washington-Baltimore Helicopter Service Investigation and operate the service if it received the authority. Although it is owned by nine of the airlines that serve Washington and Baltimore, other airlines serving the two cities are free to become owners.

Ninety-eight percent of the stock of Washington Airways is owned in equal shares by six trunkline air carriers: American Airlines, Eastern Airlines, Northwest Airlines, Pan American World Airways, Trans World Airlines and United Air Lines. The remaining two percent is owned by two local service carriers, Allegheny Airlines and Mohawk Airlines, and a trunkline carrier, Northeast Airlines. Northeast Airlines and the two local service carriers receive government subsidy. The board of directors of Washington Airways is made up of one representative of each of the owning carriers. The maximum equity contribution of each of the unsubsidized trunk carrier owners is $500,000. The maximum contribution of each of the local service carriers and Northeast is $20,000. There is a formula, based on relative amounts of revenue passenger miles of traffic transported to and from Washington and Baltimore by each of the carrier owners and the relative use of Washington Airways' services by passengers of the respective carrier owners, by which the losses expected to be generated by the helicopter operation are to be shared among the owners. So far as the local service carriers are concerned, neither of them can be made to absorb in any year any part of the loss in excess of its maximum equity investment of $20,000.00.

The record discloses that helicopter operations in the past have not been self-supporting. For a time Congress authorized the payment of subsidies to helicopter operators, and pursuant to this authority the Board certificated helicopter service for the metropolitan areas of Los Angeles, New York and Chicago. This experiment came to an end in 1965 when Congress directed that no more subsidies be paid. Since that time the service at New York and Los Angeles, as well as the service in the San Francisco Bay area, that the Board had meanwhile certificated without subsidy eligibility, have been supported by one or more trunkline carriers in each area.[5] In return for their financial assistance the fixed-wing carriers have ordinarily received favored treatment of some sort from the helicopter operators; for example, the helicopter terminals have been located at or near the terminals or gates used by the supporting fixed-wing carriers.

In a case decided in 1963 the Board concluded that the public convenience and necessity did not require helicopter service subsidized by the government in the Washington-Baltimore area. Washington, D. C., Helicopter Service Case, 38 C.A.B. 823 (1963). None of the applicants in that case was willing to accept a certificate that did not contemplate the possibility of subsidy. In 1966, however, the Board concluded that the matter should be re-examined. The Board was led to this conclusion by several factors: (1) the rapid growth of traffic in the area since 1963, (2) the congestion at

5. After the federal subsidies were terminated Chicago Helicopter Airways petitioned the Board for permission to suspend service and suspension was granted by the Board.

Washington National Airport creating a need to move flights from Washington National to more distant airports and (3) the interest in supporting helicopter service shown by trunkline carriers in other parts of the country. Accordingly, the Board began a new Washington-Baltimore helicopter service investigation, to determine whether this service could now be maintained without federal subsidy. The Board made all the trunkline carriers serving the Washington-Baltimore area parties to the case and said that they would be given an equal opportunity to participate in any financial arrangement with any helicopter operator selected for a certificate. The local service carriers of the area were also made parties. The Board's purpose in this designation of parties was to "avoid any unfair competitive disadvantage to non-participating carriers", and to insure that "any financial arrangements with trunkline carriers will not disadvantage local service carriers." C.A.B. Order No. E24–133, August 29, 1966.

The Board's order instituting the proceeding required that all applications, motions for consolidation, and other procedural motions be filed before September 29, 1966. By that date eleven applications had been filed, including the application of National Capital. There was no application by a fixed-wing carrier and none which contemplated financial support by a fixed-wing carrier. Thereafter a prehearing conference with the examiner was held by the parties, pursuant to the Board's rules,[6] and the examiner issued his prehearing conference report, defining the issues and fixing procedural dates. Eleven days later American Air Lines filed a motion for a 30-day extension of the procedural dates that had been fixed. The stated ground of the motion was that American Air Lines desired to canvass other carriers to see whether it would be possible to develop a jointly held corporation to own and operate the helicopter service. At the same time American filed its own application for a certificate and asked that this application be consolidated for hearing with the others on file, if American's motion for an extension of time were not granted. As the reason for its late filing American represented that the emergency expedient of "trunkline-helicopter financial and management relationships", adopted by the airlines after the termination of federal subsidy payments in 1965, was unsatisfactory, but that there had been "little opportunity * * * to focus on the question of a long-term answer to the helicopter service problem." American submitted that there was "good cause", under the Board's rules,[7] for its late filing, because it "is no one's fault that there has not been an opportunity heretofore to focus on" the problem of developing a permanent financing scheme for helicopter operations.

The Board granted American's motion for an extension of the established procedural dates and for the consolidation of American's application for hearing and disposition with the others on file. The Board recognized the possible hardship which its order might cause to the other applicants who had prepared their cases for hearing; and the Board expressed doubt that in a "normal and usual type of a route proceeding" the reasons advanced by American for its late filing would have constituted "good cause" for American's untimely filing. The Board found, however, that the problems involved in the proceeding were not normal or usual; on the contrary, said the Board, "they are still complex and difficult, and the answers are elusive and it is far from clear at this point that they lie in a proceeding in which we are limited to authorizing the operation of

---

6. Rules of Practice, Rule 23, 14 C.F.R. 302.23 (1969).

7. Rule 12(b) of the Board's Rules of Practice, 14 C.F.R. 302.12 (1969) requires that the movant shall "clearly show good cause for his failure to file" a motion or application on time.

such services only by persons who will be acting independently of the fixed-wing carriers who, in the final analysis, will provide the traffic which will sustain the helicopter services. The needs of the over-all public interest must govern our action herein. We find that this overriding public interest requires a consideration in the instant proceeding of the possibilities advanced in American's proposal, despite its untimely presentation." C.A.B. Order No. 25020, April 20, 1967.[8]

Following a further extension of time by the Board on June 19, 1967, Washington Airways was formed as a joint venture by the group of carriers, including American and other fixed-wing carriers serving the Washington-Baltimore area. Within the extended time allowed by the Board but before Washington Airways was incorporated, an application for a certificate was filed by the joint venturers on behalf of Washington Airways. A motion to consolidate was filed at the same time. When Washington Airways was incorporated the application was amended to make the corporation an applicant and the Board consolidated the amended application into the proceeding. C.A.B. Order E25445, July 24, 1967.[9]

After a hearing, the examiner issued his initial decision. He concluded that there was no real or urgent need for the proposed helicopter service, and found that substantial deficits would be incurred by any operator of such service. In the light of these findings he considered that the proposed service would be a "luxury" service for relatively few users which would not justify the financial assistance that would be necessary, regardless of the source of the assistance. Before reaching this conclusion, however, the examiner carefully considered and analyzed the financial and other qualifications and prospects of the applicants.

As it was authorized to do by its regulations [10] the Board acting upon its own initiative determined to review the initial decision of the examiner. It directed that any party "having objections to the initial decision shall file exceptions with the Board" and that "briefs in support of the exceptions or in support of the initial decision" might be filed. Exceptions to the initial decision were filed by all of the applicants except Washington Airways. Thereafter briefs to the Board were submitted by all parties including Washington Airways. In substance, Washington Airways in its brief supported the conclusion of the examiner with respect to the lack of need for the service and the financial losses it would entail. On the other hand Washington Airways submitted that if the Board disagreed with these conclusions and determined to certificate such a service, then Washington Airways was best qualified to provide it.

National Capital moved to strike Washington Airways' brief and to prohibit it from appearing in oral argument on the ground that the Board's order of review provided that only briefs in support of exceptions or in support of the examiner's decision would be received. In its opinion on the merits, the Board denied this motion, holding that Washington Airways had argued in support of the examiner's ultimate conclusion,

---

8. National Capital and another applicant opposed American's motion. The other applicant, Washington-Baltimore Helicopter Airways, Inc., filed in this Court a petition for review of the order granting the motion. It made the same arguments that are now made by National Capital. After argument on a motion to stay the Board proceeding pending review and on the Board's motion to dismiss, the petition for review was dismissed. No. 21,052, decided July 10, 1967.

9. National Capital objected to the application on the ground that in several respects it did not conform precisely to the Board's Rules of Practice relating to the form and contents of such documents. The Board overruled the objections as "hyper-technical", finding that National Capital had not been prejudiced by the errors if any.

10. Rule 28, Procedural Regulations, 14 C.F.R. 302.28.

674

and that it would be unreasonable to deprive Washington Airways of an opportunity to urge, in the alternative, the merits of its own application if the Board should reverse the examiner's decision that there was no need for the proposed service. C.A.B. Order Nos. 68–11–71 and 68–11–72, November 18, 1968.

On the merits the Board disagreed with the examiner and found that the public convenience and necessity required certification of the proposed helicopter service, without benefit of federal subsidy, for an experimental five-year period. The Board based this conclusion upon its finding that a substantial volume of traffic would be available to the helicopter operator, because of the remoteness of Friendship and Dulles airports from Washington and the large amount of travel to and from the seat of government by businessmen, professional people and tourists. The Board recognized nevertheless that from the beginning the operator of the service would incur substantial losses which might continue for a long time. Accordingly, the Board found that "any person undertaking to provide the service involved should be in a position to withstand substantial losses for an extended period of time."

Noting that the examiner had "undertaken a detailed analysis of the background, proposals, qualifications and forecasts of each of the applicants" the Board found that there were no decisive differences between the applicants in respect of management experience and operating proposals. In these circumstances the Board concluded that the decisive factor was financial strength.

With respect to the factor of financial strength the Board concluded that only Washington Airways had "sufficient assured financial support, with respect to both initial capital requirements and future operating support, to absorb the initial operating losses and economic risks involved in the conduct of this experiment without diminishing the qual-ity or quantity of service to be provided or compromising the helicopter management's freedom to innovate and experiment with the service at different fares and in additional markets in an effort to achieve self-sustaining operations." The Board based this conclusion upon the undisputed ability of Washington Airways to obtain its required initial investment of 6.8 million dollars by way of contributions from participating carriers and loans from commercial lending institutions. The Board noted that "the collective financial strength and resources of all of the fixed-wing carriers participating in the consortium" were available to Washington Airways. On the other hand, said the Board, National Capital proposed to raise its entire capital requirements through the sale of a six million dollar stock issue. In support of this plan National Capital presented a letter of underwriting commitment from an established underwriting firm. In its written commitment the underwriting firm stated: "We have no hesitation in stating that if your Company were to receive a Certificate to perform the services contemplated in the Washington/Baltimore Helicopter case—subject, of course, to market economic conditions and provided further that the Certificate were not too restrictive in its terms—we would be willing to undertake the formation of an underwriting group to underwrite the necessary equity financing. At this time we expect no difficulty in forming such a group." The Board found that "no assurance of success can be predicated upon a commitment of this type, and we view the economic prospects of the proposed service and the lack of success of other helicopter operators in raising large amounts of capital through equity financing, as casting grave doubts upon the ability of [National Capital] to satisfy its capital requirements without recourse to debt financing." On the basis of the evidence in the record the Board was also skeptical with respect to National Capital's forecast that it would be able to show a profit at the end of the

second year of operation and its willingness to forego any assurance of outside support. The Board pointed out, as did the examiner, that National Capital's financial optimism was inconsistent with the experience of National Capital's parent, San Francisco & Oakland Helicopter Airways, which received nearly $750,000 in support payments in its fourth year of operation. The Board agreed with the examiner that National Capital's projected profit resulted from a "severe, if not spartan, service, from the standpoint of costs".

The agreement among the air carriers to form Washington Airways required the Board's approval under Sec. 412 of the Federal Aviation Act, 49 U.S.C. § 1382. Furthermore, upon the award of a certificate to Washington Airways, Secs. 408 and 409 of the Act (49 U.S.C. §§ 1378 and 1379) required the Board to approve the interlocking relationships between the joint venturers and Washington Airways, and their control of Washington Airways. See Pan American Airways Co. v. Civil Aeronautics Board, 121 F.2d 810 (2d Cir. 1941). Specifically, Sec. 408(b) provides that

the Board "shall not approve any consolidation, merger, purchase, lease, operating contract, or acquisition of control which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier not a party to the consolidation, merger, purchase, lease, operating contract or acquisition of control: * * * ". Having examined the facts in the light of these provisions the Board, in the same order by which it awarded the certificate, approved the airlines' joint control of Washington Airways.

## THE ALLEGED PROCEDURAL ERRORS

■ National Capital claims that the Board repeatedly violated its own procedural rules so as to permit Washington Airways to take part in the proceeding, and from this premise National Capital argues that the Board deprived it of due process of law. National Capital's principal contention in this connection is that consolidation of the application of Washington Airways into the proceeding was in violation of Board Rule 12(b),[11]

11. Rule 12—Consolidation of Proceedings.
"(a) *Initiation of consolidations.* The Board, upon its own initiative or upon motion, may consolidate for hearing or for other purposes or may contemporaneously consider two or more proceedings which involve substantially the same parties, or issues which are the same or closely related, if it finds that such consolidation or contemporaneous hearing will be conducive to the proper dispatch of its business and to the ends of justice and will not unduly delay the proceedings. Although the Board may, in any particular case, consolidate or contemporaneously consider two or more proceedings on its own motion, the burden of seeking consolidation or contemporaneous consideration of a particular application shall rest upon the applicant and the Board will not undertake to search its docket for all applications which might be consolidated or contemporaneously considered.
"(b) *Time for filing.* Unless the Board has provided otherwise in a particular proceeding, a motion to consolidate or contemporaneously consider an

application with any other application shall be filed not later than the prehearing conference in the proceeding with which consolidation or contemporaneous consideration is requested. If made at such conference, the motion may be oral. All motions for consolidation or considerations of issues which enlarge, expand and change the nature of the proceedings shall be addressed to the Board, unless made orally at the prehearing conference, in which event the presiding examiner shall present such motion to the Board for its decision. A motion which is not filed at or prior to the prehearing conference, or within the time prescribed by the Board in a particular proceeding, as the case may be, shall be dismissed unless the movant shall clearly show good cause for his failure to file such motion on time. A motion which does not relate to an application pending at the time of the prehearing conference in the proceeding with which consolidation or contemporaneous consideration is requested, or on the date specifically prescribed by the Board in a particular proceeding for filing of motions for consolidation or con-

since the motion to consolidate was not filed on time.

National Capital does not contend that it did not have a full and fair opportunity to present its own case; in essence, the complaint is that because of the Board's actions an additional applicant was allowed to compete with National Capital and that applicant was chosen on the merits. The argument overlooks the fundamental principle, correctly applied by the Board, that "The Board's major standard is the public interest in having convenient routes served by fit and able carriers. These questions are to be determined in hearings after notice. The prime purpose of allowing interested persons to offer evidence is to give the Board the advantage of all available information as a basis for its selection of the applicant best qualified to serve the public interest." Civil Aeronautics Board v. State Airlines, Inc., 338 U.S. 572, 578, 70 S.Ct. 379, 383, 94 L.Ed. 353 (1950). The Board had before it the "complex and difficult" problem of providing helicopter service in the Washington-Baltimore area. The public interest required the Board to consider all available information bearing on the problem including all of the proposed solutions; if the Board had not done so it would not have carried out its statutory duties.

The petitioner's argument also overlooks the fact that Rule 12 permits the Board to consolidate applications "upon its own initiative". Thus, even if National Capital had filed its application in-

dependently and had not moved for consolidation, the Board on its own motion might have consolidated. As another alternative, the Board might have denied all timely filed applications, after hearing, and then have proceeded to an independent hearing on the application of Washington Airways. Plainly, the course adopted by the Board was sensible and in the public interest.

Other violations by the Board of its procedural rules alleged by National Capital are (1) the application of Washington Airways, as originally filed, was not signed by Washington Airways or any officer or other person authorized to act for it; (2) the application sought a "contingent" certificate, that is, one that authorized the applicant to cease operations upon incurring specified losses; (3) that the Board accepted the brief of Washington Airways although it had filed no exceptions to the initial decision; and (4) the participation of local service carriers in the enterprise would violate the Board's policy against non-transport activities by subsidized carriers. (14 C.F.R. 399.-90 (1969)). We have considered all of these objections and find them to be without merit. None of the alleged errors prejudiced National Capital. See Braniff Airways, Inc. v. Civil Aeronautics Board, 126 U.S.App.D.C. 399, 411, 379 F.2d 453, 465 (1967). Thus, the fact that the application of Washington Airways was submitted before its organization was completed and was therefore signed "on its behalf", was not prejudicial to National Capital.[12] The

temporaneous consideration, shall likewise be dismissed unless the movant shall clearly show good cause for his failure to file the application within the prescribed period." 14 C.F.R. 302.12 (1969).

12. Superior Oil Co. v. Udall, 133 U.S. App.D.C. 198, 409 F.2d 1115, decided Jan. 6, 1969, cited by petitioner, is not apposite. That case dealt with the submission of an unsigned, sealed "bid", a matter in which satisfaction of every formal requirement was vital.

The other cases cited by petitioner on this point are also distinguishable. Some of them deal with accusatory proceedings in which violations of procedural regulations resulted in prejudice amounting to a denial of due process: Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed. 2d 1012 (1959) (denial of right to have specific charges and orderly hearing and right to cross-examine, in proceeding for dismissal of employee); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) (violation of regulations resulting in discharge from em-

Board did not grant the "contingent" certificate suggested by Washington Airways. As for the filing of the brief of Washington Airways, it is plain that this was in conformity with the Board's order authorizing briefs in support of the examiner's decision. Finally the argument with respect to non-transport activities was not raised before the Board by National Capital and thus is not open to review here. 49 U.S.C. § 1486(e). In any event the contention has no merit.

## THE ANTI-TRUST QUESTION

As we have said, the agreement among the air carriers to form Washington Airways and the award of a certificate to that company required the approval of the Board under Secs. 412, 408 and 409 of the Federal Aviation Act, 49 U.S.C. §§ 1382, 1378 and 1379. The Board gave its approval. The petitioner contends that the Board erred, that contrary to the Board's findings and in violation of Sec. 408(b) of the statute, the control of Washington Airways by the carriers together with the issuance of the certificate to Washington Airways will result in the creation of a monopoly and thereby restrain competition.

██ There is no doubt that Washington Airways, as the only carrier authorized by the Board to provide the proposed helicopter service, has a monopoly. The difficulty with petitioner's argument is that the monopoly results not from the Board's approval under Sec. 408 of the ownership and control of Washington Airways by the carriers, but rather from the certification by the Board pursuant to Sec. 401. Such a monopoly will always result when the Board certificates only one carrier to serve a given market. The result would have been the same had the Board chosen National Capital instead of Washington Airways. Here there was no suggestion by anyone that the Board should certificate more than one carrier; on the contrary it was agreed by all that the Board would choose one applicant as best qualified, to the exclusion of the others. In these circumstances the Board was justified in concluding that any anti-competitive effects resulting from the control of Washington Airways by the carriers were insubstantial and speculative, and were outweighed by the advantages to be gained. Butler Aviation Company v. Civil Aeronautics Board, 389 F.2d 517 (2d Cir. 1968). The Board carefully analyzed the matter and concluded:

"We are cognizant of the difficulties created by the various support arrangements currently employed in providing financial assistance by several trunkline carriers to scheduled helicopter operations in other metropolitan areas, and we have found that considerable financial assistance will be required to sustain a new helicopter service in this area through the period of anticipated developmental losses. It appears that the formation and sponsorship of WAI by a number of fixed-wing carriers authorized to serve the Washington/Baltimore area is a justifiable attempt by the carriers to take steps on their own to deal with the problem of helicopter support. It further appears that the fixed-wing consortium, by reason of its organiza-

ployment) ; United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (denial of fair and impartial consideration by Board of Immigration Appeals) ; Pacific Molasses Co. v. F.T.C., 356 F.2d 386 (5th Cir. 1966) (denial of right to have previous notice of witnesses and documentary evidence, so as to prepare for effective cross-examination). Other cases are illustrative of procedural violations which are inherently prejudicial or illegal: Bonita, Inc. v. Wirtz, 125 U.S.App.

D.C. 163, 369 F.2d 208 (1966) (minimum wage order approved in absence of employee members of Industry Committee) ; Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 269 F.2d 221 (1959), cert. den. 376 U.S. 915, 84 S.Ct. 665, 11 L.Ed.2d 611 (1954) (ex parte attempts to influence board members) ; McKay v. Wahlenmaier, 96 U.S.App.D.C. 313, 226 F.2d 35 (1955) (award of oil and gas lease on public lands on basis of false or misleading application).

tion and express undertakings, will be able to provide a helicopter service which conforms to the Board's desire for impartiality, without preference or discrimination against non-participating carriers. Consequently, we find that the agreement, conditioned as provided for hereinafter, and the control and inter-locking relationships created thereby, should be approved under sections 408, 409, and 412 of the Act. As conditioned, we find that the fixed-wing carrier agreement creating WAI is not adverse to the public interest or in violation of the Act, and that the control relationships approved herein will not result in creating a monopoly or monopolies, and thereby restrain competition or jeopardize any air carrier not a party to the agreement." (Board's opinion, p. 35).

We think the Board's conclusion is supported by the record.

Among the conditions referred to by the Board as being imposed were (1) that the consortium be open to any carrier servicing Washington or Baltimore and (2) that it retain jurisdiction of the consortium for the purpose of taking any such further action as might be found necessary, including a determination of the reasonableness of rates and the prohibition of any discriminatory activities. Finally, the Board proposed to continue to permit the operation of regularly scheduled and irregular inter-airport or taxi service in competition with the authorized helicopter operations. These conditions were effective safeguards against improper activities on the part of the certified carrier.

The Board noted also that the "interval scheduling policy" of Washington Airways would assure that no preference was given to a minority of carriers. Under this policy Washington Airways proposed to schedule helicopter arrivals and departures at each of the three airports at regular intervals throughout the day, rather than to gear its schedules to the arrivals and departures of specific fixed-wing flights serving the Washington and Baltimore airports. It appears also that the gate arrangements at the Washington and Baltimore airports make it difficult if not impossible to favor any particular carrier by the location of the takeoff and landing points of helicopters.

The petitioner argues that the certification of the Washington Airways consortium may eliminate the potential competition of one or more trunkline carriers in the Washington-Baltimore helicopter market. See United States v. Penn-Olin Chemical Co., 378 U.S. 158, 173–174, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). The history of helicopter operations refutes the argument. No trunkline carrier is presently providing helicopter services in any market and no such carrier has ever sought certification to provide helicopter service on an individual basis. Nor is there any reason to believe that in the foreseeable future any individual carrier will request the privilege of sharing the losses involved in the Washington-Baltimore helicopter service. In short the facts of economic life would have produced the same result had the petitioner received a certificate and thus been granted the monopoly. If economic conditions should change, however, so that competition becomes practical, the Board is in a position to certificate a competing service.

## THE SELECTION OF WASHINGTON AIRWAYS FOR CERTIFICATION

The petitioner challenges the Board's selection of Washington Airways rather than National Capital as the operator best qualified to provide the needed helicopter service. It says in particular that the Board's findings with respect to the adequacy of National Capital's financial plans were unsupported by the record.

Our consideration of this issue is of course limited by the provision of Sec. 1006(e) of the Federal Aviation Act, 49 U.S.C. § 1486(e), that the findings of

fact by the Board if supported by substantial evidence shall be conclusive. If the Board's ultimate conclusions rationally follow from facts properly found, that is the end of the matter. On the other hand, if after reviewing the whole record we find that the Board's findings and conclusions are unsupported by substantial evidence, then it is our duty to set them aside. Administrative Procedure Act, 5 U.S.C. § 706(2) (E) (Supp. IV, 1965–1968); North American Airlines, Inc. v. Civil Aeronautics Board, 100 U.S.App.D.C. 5, 240 F.2d 867 (1956), cert. den. 353 U.S. 941, 77 S.Ct. 815, 1 L.Ed.2d 760 (1957); Braniff Airways, Inc. v. Civil Aeronautics Board, 126 U.S. App.D.C. 399, 379 F.2d 453 (1967).

Considering the whole record in the light of the statutory definition of our province, we hold that the Board's findings and conclusions were reasonable, proper and supported by substantial evidence. As we have said, the Board considered and approved the examiner's careful and detailed analysis of the background, proposals, qualifications and forecasts of each of the applicants; and upon the basis of the examiner's findings with respect to these matters the Board concluded that the crucial difference between National Capital and Washington Airways was the superior financial strength of Washington Airways. We cannot say that this conclusion was unreasonable or unsupported by substantial evidence. The weight to be given to the factor of financial strength was a matter for the expert judgment of the Board. In view of the history of helicopter operations the Board not unreasonably concluded that the Washington-Baltimore service would impose substantial losses upon the operators, so that adequate financial support was vital. Nor was it unreasonable for the Board to conclude that National Capital was overly optimistic with respect to its financial prospects. Here again the dismal financial history of helicopter operations was a reasonable basis for the Board's conclusion. Comparing the financial backing of the two applicants

it was not unreasonable for the Board to prefer the assured financial support of Washington Airways over the written underwriting commitment offered by National Capital, which pledged the underwriter only "subject, of course, to market economic conditions * * * to undertake the formation of an underwriting group to underwrite the necessary equity financing." Finally, there was support for the Board's preference of Washington Airways in its finding, based upon an analysis of National Capital's projected profit, that National Capital contemplated "severe, if not spartan, service, from the standpoint of costs".

Upon the whole record we conclude that there was no error in the Board's order.

Affirmed.