Jane DOE, Appellant,

v.

Robert E. HAMPTON, Individually and as Chairman, U. S. Civil Service Commission, et al.

No. 76–1090.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1977.

Decided Sept. 14, 1977.

Rehearing Denied Nov. 3, 1977.

Robert B. Cornell, Washington, D. C., for appellant.

William J. O'Malley, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and William P. Pease, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before TAMM, ROBINSON and ROBB, Circuit Judges.

Opinion filed by TAMM, Circuit Judge.

Concurring opinion filed by ROBB, Circuit Judge.

Dissenting opinion filed by SPOTTS-WOOD W. ROBINSON, III, Circuit Judge.

TAMM, Circuit Judge:

██ We are summoned in this case to review the award of summary judgment against a federal civil-service employee dismissed from her job on grounds of mental disability.[1] We vacate that judgment and remand the case to the district court for a determination of whether a certain provision of the Civil Service Commission's *Federal Personnel Manual* is a regulation binding upon the employing agency, and if found to be such, for a further determination of whether the agency substantially complied with it.

I

██ Our pseudonymous appellant formerly was employed as a clerk-typist, GS-3, in the Office of Research and Technical Services (ORTS), Bureau of Engraving and Printing (Bureau or agency), Department of the Treasury. Hired by the Bureau in June of 1971, appellant came to her new job with two years of prior federal employment and thus enjoyed civil-service protection as a non-probationary federal employee. For her first few months with the Bureau, appellant performed her duties without apparent difficulty. In October 1971, for in-

1. The complaint alleged jurisdiction in the district court to entertain this suit based on both the Administrative Procedure Act and the general federal question statute, 28 U.S.C. § 1331 (1970), *amended by* Pub. L. No. 94-574, 90 Stat. 2721 (Oct. 21, 1976). Although the juris-diction that might have been predicated upon the former basis has evaporated after the Supreme Court's decision in *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the complaint clearly survives upon the latter.

stance, she received a descriptive performance evaluation of "well qualified" with a near-perfect performance requirement record.[2] Record 70. Some months later, however, she began to exhibit an emotional instability which thereafter required several lengthy absences for hospitalization[3] and, the agency claims, frequently disrupted office routine and reduced her job effectiveness.

When these problems continued with only occasional surcease, the agency, in March 1973, directed appellant to undergo a fitness-for-duty examination[4] in order to ascertain her suitability for continued employment.[5] Appellant agreed to have this examination, and, after a general physical examination the day before by a Dr. Tremols, she underwent a one-time, 45-minute psychiatric examination conducted by a Dr. Calixto Valle, III, on April 17, 1973. Dr. Valle, who never had occasion to reexamine appellant, diagnosed her condition as "schizophrenia, chronic-undifferentiated, compensated" and concluded that she was "not fit for duty at this time." Dr. Valle's medical

2. Of course, an agency is not estopped from discharging an employee for "cause" where its only written evaluation of the employee's performance is satisfactory. An unsatisfactory performance evaluation is generally not a prerequisite to removal. *See Seebach v. Cullen*, 338 F.2d 663, 665 (9th Cir.1964), *cert. denied*, 380 U.S. 972, 85 S.Ct. 1331, 14 L.Ed.2d 268 (1965); *Angrisani v. United States*, 172 Ct.Cl. 439 (1965). *See also Thomas v. Ward*, 96 U.S. App.D.C. 302, 225 F.2d 953 (1955), *cert. denied*, 350 U.S. 958, 76 S.Ct. 348, 100 L.Ed. 833 (1956).

3. *See* Government's Brief at 3 n.2; text accompanying note 25 *infra*.

4. The memorandum directive to take a fitness-for-duty examination, written by the Bureau Head of Employee Relations, contained the following allegations of disruptive behavior:

I have directed that this examination be conducted to determine your fitness for duty because of your continued periodic disruptive behavior which causes undue problems to the small staff of this office and creates confusion in the work area. Your erratic behavior apparently stems from an emotional problem for which you receive treatment and medication at St. Elizabeths' [*sic*] Hospital. The seriousness of your problem first became apparent to this office when, on January 3, 1972, you became hysterical while working on an inventory of currency with Mr. Burnell. You became hysterical, throwing currency in the air, intermittently sobbing and laughing unnaturally. Efforts to calm you were unsuccessful and you were taken by ambulance to George Washington Hospital. The next day you returned to work, again became hysterical, and had to be taken to your mother's home. Your behavior was the same the following day. Your family was contacted and stated they were aware of your condition and would take every precaution to see that you got proper medical and psychiatric care. You were absent from January 7, until February 14, 1972, during which time you received treatment at D. C. General and St. Elizabeths' [*sic*] Hospitals.

Your work deteriorated following your return, possibly due to heavy tranquilizing medication. You would sit, staring into space and have to be reminded to go ahead with your duties. Even when "normal" you avoided performing tasks you disliked. You spent an undue amount of time out of the office and were very slow in performing your work. You required constant supervision and instructions which you failed to follow. On December 7, 1972, you again became hysterical in the office, laughing and sobbing unnaturally, incoherent in speech, and disoriented. Again you were referred to St. Elizabeths' [*sic*] Hospital where you remained as an inpatient until January 5, 1973. You returned to duty on January 12, 1973. Your behavior since you returned is very disruptive. You have become uncooperative and on January 12 and 13 bordered on the insubordinate, refusing to perform an assigned task. On February 5, you again disrupted the office, began sobbing and seemed very depressed. It was necessary to send you home. On March 1, 1973 Dr. Cook entered Room 106 at approximately 8:20 a. m. and found you sitting at your desk giggling and laughing hysterically. This action was still continuing at 8:30 a. m. Dr. Cook advised you to go to the Health Unit and they sent you home in a Bureau car. You stayed out on Friday, March 2, 1973, and reported for work on Monday, March 5, 1973 on which date you spent a portion of time staring into space and doing no work. Hospitalization and treatment have had no lasting effect. Record 18–19, 96–97.

5. By the time the agency requested this examination, appellant had been under outpatient treatment weekly at St. Elizabeth's Hospital for at least one year, Record 102–03, and had been absent from work on numerous occasions due to illness or treatment of her illness for periods totaling approximately 85 days, *see id.* at 61–64; text following note 25 *infra*.

opinion consisted only of these two above-quoted conclusions, jotted down at the bottom of the official examination form. *Id.* 48–50. This unelaborated medical "impression" was then incorporated into a report which, in turn, was "concurred in" by the Bureau's own Health Unit physician, Dr. N. V. Scorzelli.[6] *Id.* 100.

The Bureau finally notified appellant that it was seeking her removal and placing her in leave-without-pay status pending conclusion of separation proceedings within the agency. Her removal notice reiterated the allegations set forth in the earlier fitness-for-duty examination directive, *see* note 4 *supra,* and added further:

> Because of your periodic disruptive behavior which causes undue problems to the small staff of this office and creates confusion in the work area, I [the Chief, ORTS] directed you to take a fitness-for-duty examination by letter of March 12, 1973. This letter states specifics of your erratic behavior and is attached as a part of this notice of proposed removal. You elected to have this examination conducted by the Public Health Service and named your sister . . . to represent you to see that your rights were protected.

In a memorandum dated May 18, 1973, Dr. N. V. Scorzelli, Medical Officer in charge of the Health Unit of this Bureau, informed [the] . . . Chief, Office of Industrial Relations, that he had received from the United States Public Health Service Outpatient Clinic results of the fitness-for-duty examination conducted in your case. The examination was conducted by Dr. Jose G. Tremols [*sic*] [Dr. Valle] whose diagnostic conclusion was "that due to your mental condition you are not fit for duty at this time." Dr.

Scorzelli advised that this is a chronic condition and he concurs with these findings. (You are not eligible for disability retirement inasmuch as you do not have five years of Federal Service.).

Record 94.

Appellant responded to this notice orally and in writing. Her written communication transmitted a mental status and employment capacities report, prepared at appellant's request by another Public Health Service psychiatrist, Dr. F. Wm. Bernet, which prognosticated that "with continued therapy and medication [appellant] will be employable" and recommended that she be permitted to return to her job at the Bureau. *Id.* 84, 86. Soon after receiving this report, the Bureau Head of the Employee Relations Branch met with Dr. Scorzelli and his nursing assistant and agreed to proceed with the removal proceedings since, notwithstanding Dr. Bernet's favorable conclusion,[7] "it was the consensus of opinion that, inasmuch as [appellant's] condition is chronic, there would be no lasting improvement . . . ." *Id.* 81. Appellant finally was separated from her agency on June 29, 1973, on grounds that she was not fit for duty and that her removal was necessary to promote the efficiency of the service.[8] *Id.* 78–79.

Post-termination administrative appeal proceedings then commenced at her behest. *See* 5 C.F.R. Part 771 (1974). An adjudicatory hearing was held at the agency in September before an independent Appeals Examiner, during which both parties submitted evidence and introduced the testimony of various witnesses, Dr. Valle, the practicing psychiatrist, among them. The examiner subsequently recommended that the removal action be upheld as warranted by the evidence and in compliance with appli-

---

6. Dr. Scorzelli apparently was not a psychiatrist, and the record furnishes no basis for concluding that he was otherwise competent to render such a concurrence.

7. Dr. Bernet's opinion that "with continued therapy and medication [appellant] will be employable" was interpreted by agency officials as signifying "that there will be no permanent solution for her condition." *See* Record 81.

8. After March 1, 1973, there apparently were no further complaints about appellant's job performance or her general demeanor. In fact, her chief supervisor expressed satisfaction with her improved condition after Dr. Valle's examination. Tr. 77, 205; *see* Record 39.

cable procedural requirements, and this recommendation was adopted by the agency as its final decision in February 1974.

Appellant proceeded then to the next stage of her available administrative remedies, *see id.* Part 772, by appealing the agency's decision to the Civil Service Commission's (Commission) Appeals Examining Office (AEO), which ultimately sustained the decision as reasonable and procedurally sound. The AEO chose not to confine its review to the existing record, however, as counsel for appellant apparently had anticipated. *Compare* Record 26 *with id.* 120. Instead, it sought and received the additional medical opinion of a Dr. Eck, Chief of the Bureau of Retirement, Insurance and Occupational Health's Medical Division, on the question whether "the observed deficiencies in [appellant's] performance, outlined above, are attributable to her diagnosed disabling condition; and whether this condition would make the employee a hazard to herself or others." *Id.* 25. Dr. Eck's medical statement, which was later incorporated into the AEO's affirmance, opined only that

> the observed deficiencies and other actions are a result of her diagnosed mental illness. The psychiatric findings in the file [9] reveal meager paranoid or hallucinatory elements, and for this reason could conclude that her condition is not a hazard to herself or others. However, suicide and homicide are of danger in schizophrenia, and it is a most difficult assessment to make as to the possibility or probability of their being a hazard to themselves or others.

*Id.* 23.

A final administrative appeal was then taken to the Commission's Appeals Review Board (ARB) [10] which affirmed the AEO's decision, concluding that the AEO's action in submitting appellant's case file to Dr. Eck for an additional medical opinion had been proper and that the AEO's decision had been an independent one based on its reasonable evaluation of the record evidence.

With her administrative remedies finally exhausted, *see* 5 C.F.R. § 772.307(c) (1974), appellant brought suit in the district court seeking the usual declaratory, injunctive, and compensatory relief. This proved unavailing, however, for the trial judge granted the Government's motion for summary judgment upon consideration of the pleadings, cross-motions for summary judgment, and the administrative record. Undeterred, appellant has followed the usual course in availing herself of a duplicative appeal to this court,[11] arguing once again that the agency failed to comply with applicable personnel regulations, that its decision was arbitrary and irrational, and that the AEO's communication with Dr. Eck denied appellant the due process to which she was entitled.

---

**9.** The "psychiatric findings in the file" presumably included something more than Dr. Valle's abbreviated conclusion based on a 45-minute session more than a year previous. Dr. Eck had no personal knowledge of appellant whatsoever. *But cf. Jenkins v. United States,* 113 U.S.App.D.C. 300, 304, 307 F.2d 637, 641 (1962) (*en banc*).

**10.** Due to a reorganization of appeals functions, the ARB replaced the Commission's Board of Appeals and Review during the pendency of appellant's administrative appeal.

**11.** We have previously questioned the utility of the present system of duplicative judicial review of federal personnel actions, with no perceptible effect. *See, e. g., Polcover v. Secretary of Treasury,* 155 U.S.App.D.C. 338, 340–343, 477 F.2d 1223, 1225–28 & n.11 *cert. denied,* 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973);

*Goldwasser v. Brown,* 135 U.S.App.D.C. 222, 224, 417 F.2d 1169, 1171 n.1 (1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 918, 25 L.Ed.2d 103 (1970); *Scott v. Macy,* 131 U.S.App.D.C. 93, 96, 402 F.2d 644, 647 n.6 (1968). Without belaboring the point further, we would only invite attention to the practicable drawbacks of the current arrangement as manifested by the almost two-year duration from the filing of the instant action in the district court and its oral argument before this court, with the only intervening event worth noting having been an award of summary judgment for the employing agency without opinion or memorandum explanation. *See generally* Johnson & Stoll, *Judicial Review of Federal Employee Dismissals and Other Adverse Actions,* 57 Corn.L.Rev. 178, 188–97 (1972).

## II

■ In passing upon appellant's claims, we must remain cognizant of the confines of our review. While the transition from unreviewability [12] to reviewability of adverse personnel actions against federal employees has left a legacy of some disagreement and confusion in the reported cases, it is at least reasonably well-settled that,

whatever its exact scope, judicial review in the federal courts is necessarily limited. Federal judges do not sit as ombudsmen for government employment relations,[13] nor do we indulge the conceit of substituting our own judgment *ad libitum* for that of the agency.[14] Rather, we concern ourselves in the personnel business only insofar as is necessary to assure that the action challenged (1) is not arbitrary or capricious; [15]

12. See e. g., *Eberlein v. United States,* 257 U.S. 82, 84, 42 S.Ct. 12, 66 L.Ed. 140 (1921) ("It is settled that in such cases the action of executive officers is not subject to revision in the courts."); *Green v. Baughman,* 100 U.S.App. D.C. 187, 190, 243 F.2d 610, 613, *cert. denied,* 355 U.S. 819, 78 S.Ct. 25, 2 L.Ed.2d 35 (1957); *Carter v. Forrestal,* 85 U.S.App.D.C. 53, 54–55, 175 F.2d 364, 365–66 *cert. denied,* 338 U.S. 832, 70 S.Ct. 47, 94 L.Ed. 507 (1949).

13. See, e. g., *Bishop v. Wood,* 426 U.S. 341, 349, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Mazaleski v. Treusdell,* No. 75–1817, 183 U.S.App. D.C. —— at ——, 562 F.2d 701, at 722 (1977).

14. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

15. It is still not completely clear what the appropriate formula should be, if any, for judicial review of the evidence supporting agency findings in adverse personnel actions. Earlier cases almost always characterized the scope of review as limited to assuring procedural compliance and applying the so-called arbitrary or capricious test. See e. g., *Pauley v. United States,* 419 F.2d 1061, 1065 (7th Cir. 1969); *Brown v. Zuckert,* 349 F.2d 461, 463 (7th Cir. 1965), *cert. denied,* 382 U.S. 998, 86 S.Ct. 588, 15 L.Ed.2d 486 (1966); *McTiernan v. Gronouski,* 337 F.2d 31, 34 (2d Cir. 1964); *Eustace v. Day,* 114 U.S.App.D.C. 242, 242, 314 F.2d 247, 247 (1962) (per curiam); *Jenkyns v. Bd. of Education,* 111 U.S.App.D.C. 64, 65, 294 F.2d 260, 261 (1961) (per curiam). *See also Seebach v. Cullen,* 338 F.2d 663, 665 (9th Cir. 1964), *cert. denied,* 380 U.S. 972, 85 S.Ct. 1331, 14 L.Ed.2d 268 (1965).

Although a finding that a decision is not "arbitrary or capricious" clearly must rest upon a corollary finding that the relevant factors upon which the decision is assertedly based are supported by some evidence, see *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* this court and at least one other have described the appropriate scope of review as including both a determination of the rationality of the decision and of the evidentiary support for it, perhaps only for emphasis' sake. See, e. g., *Jenkins v. Macy,* 357 F.2d 62, 67–68 (8th Cir. 1966); *Dabney v. Freeman,* 123 U.S.

App.D.C. 166, 170, 358 F.2d 533, 537 (1965); *Pelicone v. Hodges,* 116 U.S.App.D.C. 32, 33, 320 F.2d 754, 755 (1963).

More recently, many and perhaps most of the judicial decisions reviewing adverse personnel actions also apply, or at least claim to apply, a so-called "substantial evidence" test. *See, e. g., Alsbury v. United States Postal Service,* 530 F.2d 852, 854 (9th Cir.), *cert. denied,* 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976); *Polcover v. Secretary of Treasury, supra,* 477 F.2d at 1226–27; *Moore v. Administrator,* 155 U.S. App.D.C. 14, 17, 475 F.2d 1283, 1286 (1973) (per curiam); *Charlton v. United States,* 412 F.2d 390, 395 (3rd Cir. 1969); *Vigil v. Post Office Dept.,* 406 F.2d 921, 924 (10th Cir. 1969); *Meehan v. Macy,* 129 U.S.App.D.C. 217, 232, 392 F.2d 822, 837, *modified on other grounds,* 138 U.S.App.D.C. 38, 425 F.2d 469 (1968); *Halsey v. Nitze,* 390 F.2d 142, 144 (4th Cir.), *cert. denied,* 392 U.S. 939, 88 S.Ct. 2316, 20 L.Ed.2d 1399 (1968); *Finfer v. Caplin,* 344 F.2d 38, 41 (2d Cir.), *cert. denied,* 382 U.S. 883, 86 S.Ct. 177, 15 L.Ed.2d 124 (1965); *Camero v. United States,* 345 F.2d 798, 800, 170 Ct.Cl. 490 (1965).

The legal source for this requirement that an adverse federal personnel action be supported by substantial evidence is however, far from clear. For instance, under the Administrative Procedure Act, the substantial evidence test is limited to cases subject to sections 556 and 557 of that statute, as codified, or otherwise required to be reviewed on the record of an agency hearing provided by statute. 5 U.S.C. § 706(2)(E) (1970). Decisions involving the "selection or tenure" of federal employees are expressly excluded from the application of sections 556 and 557, *id.* §§ 554(a)(2), 556–557, and no other statute requires that an agency or Civil Service Commission hold a hearing on the record, *see id.* §§ 7501, 7512, though Commission regulations do, 5 C.F.R. § 771.307(b) (1977). *See also* 16 U.S.C. § 825*l*(b) (1970) (FPC); 29 *id.* § 160(f) (NLRB).

As a matter of practicability, it may not much matter how reviewing courts choose to label the tests they apply. Labels, experience tells us, seldom have much analytical utility and just as often may lead judges into a semantic Serbonian Bog. While an adverse action supported by substantial evidence of record may still be arbitrary and capricious, *Bowman*

(2) was reached in conformity with relevant procedural requirements;[16] and (3) was not otherwise unconstitutional.[17]

■ Our review, as that of the district court before us, is limited to scrutinizing the administrative record accreted as the adverse action proceeds along its tortuous course up through the various levels of appeal. No *de novo* hearing is held,[18] and, in this particular case, at least our review of the record is undertaken with the ultimate aim of determining whether the Government was entitled to its summary judgment as a matter of law, the parties having in effect agreed during the proceedings below that there were no factual issues outside of the certified record. *See* Fed.R.Civ.P. 56(c); *Bouchard v. Washington*, 168 U.S. App.D.C. 402, 405, 514 F.2d 824, 827 (1975).

### III

### A

Appellant first argues that the Bureau failed to establish any rational connection between the medical conclusions of Dr. Valle and the observed deficiencies asserted as grounds justifying appellant's removal. Appellant's Brief at 23–26. The AEO and ARB both concluded that the requisite causal link had been satisfactorily established, and we agree.

✓ ■ In law as well as logic, there must be a clear and direct relationship demonstrated between the articulated grounds for an adverse personnel action and either the employee's ability to accomplish his or her duties satisfactorily or some other legitimate governmental interest promoting the "efficiency of the service."[19] Absent a nexus between the "cause" asserted—here mental disability—and "promotion of the efficiency of the service," the adverse action must be condemned as arbitrary and capricious for want of a discernible rational basis.[20] *See e. g., Norton v. Macy*, 135 U.S.App.D.C. 214, 220, 417 F.2d 1161, 1167 (1969) (alleged homosexual advance); *Scott v. Macy*, 121 U.S.App.D.C. 205, 208, 349

---

*Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), for instance if there is no rational connection between the grounds charged and the interest assertedly served by proceeding against the employee, *see, e. g., Norton v. Macy*, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969); *Mindel v. Civil Service Comm'n*, 312 F.Supp. 485 (N.D.Cal.1970); *but see Alsbury v. United States Postal Service, supra*, 530 F.2d at 856 ("dismissal was supported by substantial evidence and thus was neither arbitrary nor capricious"), an action that is not arbitrary or capricious logically must have some if not substantial evidentiary support in the record. To require more evidence than would be sufficient for a decision to pass muster under the arbitrary or capricious test of 5 U.S.C. § 706(2)(A) is, in effect, to invent a more generous judicial review of these personnel matters than the reviewing courts are entitled to. *Accord, Wroblaski v. Hampton*, 528 F.2d 852, 853 (7th Cir. 1976); *Charlton v. United States, supra*, 412 F.2d 395–400 (Stahl, J., concurring).

16. *See e. g., Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012, (1959); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Hargett v. Summerfield*, 100 U.S. App.D.C. 85, 88, 243 F.2d 29, 32, *cert. denied*, 353 U.S. 970, 77 S.Ct. 1060, 1 L.Ed.2d 1137 (1957).

17. *See e. g., Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Powell v. Zuckert*, 125 U.S.App.D.C. 55, 366 F.2d 634 (1966) (fourth amendment violation); *Swaaley v. United States*, 376 F.2d 857, 180 Ct.Cl. 1 (1967) (alleged first amendment violations).

18. *Polcover v. Secretary of Treasury, supra*, 477 F.2d at 1226.

19. This requirement is one of long-standing. *See e. g.*, 43 U.S.C.S. Ann.Rep. 36 (1926) ("A cause sufficient to warrant a removal must be personal to the employee and such as to render him unfit for the position he occupies.").

20. The nexus requirement serves the salutary end of helping to ensure against abuse of personnel regulations by mandating that an adverse action be taken only for reasons that are directly related to a legitimate governmental interest, such as job performance. As a corollary, it also serves to minimize unjustified governmental intrusions into the private activities of federal employees.

The nature of the particular job as much as the conduct allegedly justifying the action has a bearing on whether the necessary relationship obtains. The question thus becomes whether the asserted grounds for the adverse action, if found supported by evidence, would directly relate either to the employee's ability to perform approved tasks or to the agency's ability to fulfill its assigned mission.

F.2d 182, 185 (1965) ("immoral" conduct must be shown to be "related to 'occupational competence or fitness'"); *Mindel v. United States Civil Service Commission*, 312 F.Supp. 485 (N.D.Cal.1970) (meretricious romance). *See generally Gayer v. Schlesinger*, 160 U.S.App.D.C. 172, 180, 183, 490 F.zd 740, 748–51 (1973) (homosexuality).

This so-called nexus requirement is articulated with varying degrees of particularity throughout the laws, regulations, and policies governing the civil service system.[21] Most generally, for example, an adverse personnel action may not be taken against an employee covered, as appellant was, by chapter 752 of the *Federal Personnel Manual* except for "such cause as will promote the efficiency of the service." 752 FPM 1–3 (Apr. 1972); *accord*, Lloyd-LaFollette Act § 6(a), *codified* at 5 U.S.C. § 7501(a) (1970); 5 C.F.R. § 752.104(a) (1974). This standard—a leitmotif throughout federal personnel administration—is refined by the *Manual* when it further delimits to certain specified employment concerns:

A just and substantial cause is necessary as a basis for an adverse action and the action must be determined on the merits of each individual case.

752 FPM 1–3 (Apr. 1972). Finally, and most precisely to the point of our present case, the *Manual* clarifies that a mental or physical disability indeed may warrant removal under the procedures established by chapter 752, but specifically requires that in undertaking such medical disability proceedings an agency must link the disability to certain specified employment concerns:

*The agency must not rely solely upon a showing that the employee has a disabling condition, even when the agency has obtained a medical opinion of incapacity.* Neither the placement of limitations on the duties which an employee is

permitted to perform nor medical conclusions about the employee's physical condition is sufficient cause for taking adverse action. *The agency must establish a link between the medical conclusion and (i) observed deficiencies in work performance or employee behavior or (ii) high probability of hazard when the disabling condition may result in injury to the employee or others because of the kind of work the employee does.* When an agency can clearly show high probability of serious hazard—for example, an agency has indisputable evidence that a truck driver with epilepsy is subject to grand mal seizures—the agency does not have to wait for the employee to have a serious accident on the job before taking adverse action. The medical evidence linked with the showing of potential hazard would be sufficient cause for taking adverse action. *In all other cases, however, the agency must link the medical conclusion with observed deficiencies in work performance or employee behavior.*

752–1 FPM S1–3a(5)(f) (Feb. 1972) (emphasis added).

■ With the exception of the unparticularized assertion of Dr. Eck in his medical opinion to the AEO, there was not the slightest suggestion that appellant's incapacity posed a "high probability of hazard . . . to [herself] or others because of the kind of work [she] does." The Government does not argue to the contrary—as it reasonably could not on the basis of the present record—but contends rather than substantial evidence apart from Dr. Eck's opinion clearly established the necessary causal link between the medical conclusion reached in the fitness-for-duty examination and appellant's disruptive behavior and unsatisfactory job performance. Thus, it characterizes Dr. Eck's opinion as "merely cumulative, rather than operative."

**21.** Individual agencies oftentimes will have promulgated their own, further refined personnel rules to deal with removal actions, but none of the Bureau's has been mentioned in this case, if, indeed, it has any. This leaves us for the most part, then, with the applicable provisions of title 5 of the *United States Code*, of title 5 of the *Code of Federal Regulations*, and that massive thesaurus of rules, guidelines, suggestions, and secular imprecations: the Commission's *Federal Personnel Manual*.

Government's Brief at 8 n.4. It is, then, to the so-called "operative" record evidence of observed work-related deficiencies that the agency must have linked the medical opinion of disability.

It is true, as government counsel conceded at oral argument, that the administrative record before us contains no precise and explicit nexus statement by the agency. Were we to require an employing agency to exclaim—"*ecce nexus*"—whenever it sought to separate an employee on disability grounds, we perhaps might have reached a different result in this case. We refrain from imposing such a wooden, formalistic requirement on the agency, however, believing that it is enough to satisfy the *Manual's* nexus requirement if the agency has furnished a rational basis in the evidence for its conclusion that a diagnosed medical problem has adversely affected the employee's job-related behavior or performance. From our reading of the administrative record in the instant case, we think it rather obvious that appellant's diagnosed medical problems at times *did* substantially and adversely affect her work performance and employment behavior. At other times, it is true, her psychiatric problems—to the ex-

tent they were of a continuing nature—did not manifest themselves in any negative, occupationally-related manner. Still, for what we consider a rather generous period of time, the Bureau did subordinate its legitimate interests in the efficient performance of its tasks [22] and in maintaining a satisfactory level of office morale [23] in order to accommodate and help ameliorate appellant's unfortunate emotional problems.

We are not much impressed with counsel for appellant's imaginative attempt to limit the signification of Dr. Valle's psychiatric conclusion to nothing more than an immaterial datum of evidence that appellant was mentally "not fit for duty" only on the particular day of her psychiatric examination, so that the diagnosis could not theoretically be related to instances of "observed deficiencies" on any previous day.[24] *See* Appellant's Brief at 24–25. There is not, in fact, insofar as we have been able to determine, a requirement of any greater showing than was made by the Bureau here. While we are also not much impressed with the value of the psychiatric examination administered to appellant by Dr. Valle, *see infra* at 35–36, at least from what appears of it in

**22.** *See e. g., Dozier v. United States*, 473 F.2d 866, 868 (5th Cir. 1973) (inefficiency); *Washington v. Summerfield*, 97 U.S.App.D.C. 105, 228 F.2d 452 (1955) (unsatisfactory attendance and examinations); 752–1 FPM S3–1(a) (Oct. 1976).

**23.** *See, e. g., Green v. Baughman, supra*, 243 F.2d at 613 (discourteous behavior towards subordinates); *Schlegel v. United States*, 416 F.2d 1372, 1378, 189 Ct.Cl. 30 (1969), *cert. denied*, 397 U.S. 1039, 90 S.Ct. 1359, 25 L.Ed.2d 650 (1970) (evidence that employee committed four homosexual acts on three different individuals on four separate occasions indicated that morale and efficiency would be adversely affected); *Krennrich v. United States*, 340 F.2d 653, 654, 169 Ct.Cl. 6, *cert. denied*, 382 U.S. 870, 86 S.Ct. 147, 15 L.Ed.2d 109 (1965) (derogatory anonymous letters by federal employee to agency official and wife of fellow employee sufficient cause irrespective of truth of accusations). *See also* 5 C.F.R. § 731.202 (1977).

**24.** Dr. Valle testified that he used the term "chronic" to mean that appellant's schizophrenia "has been present for awhile . . .," though he could not determine specifically how long. Tr. 42–43. While Dr. Valle also testified

that the term did not mean that the patient would suffer from it forever, *id.* 58, we do not find persuasive appellant's interpretation of his examination report and subsequent testimony as indicating that she had not suffered from "a mental handicap which would prevent [her] from engaging in substantial gainful federal employment for more than a single day." Appellant's Brief at 24.

We also do not consider the Bureau's occasionally imprecise interpretation of "chronic" in Dr. Valle's diagnosis to be the "morbid, irrational abreaction" that appellant characterizes it, *id.* at 23, or to have rendered its removal action arbitrary and capricious. We cannot say that the agency's treatment of the evidence was without a rational basis, and we do not presume to substitute our own judgment as to the weight to be accorded the medical evidence in the record. *See Ellmore v. Brucker*, 99 U.S. App.D.C. 1, 3, 236 F.2d 734, 736, *cert. denied*, 352 U.S. 955, 77 S.Ct. 329, 1 L.Ed.2d 244 (1956); *Scroggins v. United States*, 397 F.2d 295, 299–300, 184 Ct.Cl. 530, *cert. denied*, 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968). *See also Mendelson v. Macy*, 123 U.S.App.D.C. 43, 47, 356 F.2d 796, 800 (1966).

the record, the medical conclusion based upon that fitness-for-duty examination was indisputably one of mental disability and employment incapacity. The removal notice expressly incorporated the directive-to-undergo letter and the findings of the examination which, when taken together, were sufficient both to satisfy the requirement that the nature of the charges be complete and detailed, 5 U.S.C. § 7512(b)(1) (1970), and to establish the requisite link between the medical conclusion and the observed deficiencies noted in the directive to undergo the examination.

Confronted with another case, we might well require more than Dr. Valle's terse, unelaborated medical conclusion that appellant was "not fit for duty at this time." His examination, such as it may have been, however, is far from the only evidence of record underscoring appellant's mental disability and its adverse effect on her value as a federal employee. Our careful review of the record in this case fortifies us in our conclusion that the agency's decision, which the Commission subsequently approved was not so lacking in evidentiary support as to be condemned and set aside as arbitrary. *See Dabney v. Freeman,* 123 U.S.App.D.C. 166, 170, 358 F.2d 533, 537 (1965). *See also Mendelson v. Macy,* 123 U.S.App.D.C. 43, 47, 356 F.2d 796, 800 (1966).

For instance, we have before us, as did prior reviewing tribunals, uncontested evidence that during appellant's two years with the Bureau she was absent from work due to psychiatric illness or its treatment for periods aggregating more than 92 days on 72 occasions.[25] Record 61; *see id.* 55–64. These absences were in part attributable to continuing outpatient therapy at a unit of St. Elizabeth's Hospital since January 1972,

Record 84, an absence from work during the period January 7, 1972, to February 14, 1972, during which time she was treated at D.C. General and St. Elizabeth's Hospitals, *id.* 115, and inpatient treatment at St. Elizabeth's and convalescence from December 7, 1972, to January 5, 1973. *Id.* 84, 115.

The record also reveals that the Bureau expended considerable time and expense in attempting to accommodate her disability. During her tenure at the agency, for instance, nurses were summoned to care for her five times, she was brought to the Mental Health Clinic by co-workers four times, taken by Bureau car to St. Elizabeth's Hospital 44 times, taken to George Washington Hospital by ambulance once, taken to the hospital by Bureau car three times, and sent home by Bureau car six times. *Id.* 59–60. Finally, we note that a doctor at St. Elizabeth's had diagnosed appellant's condition on January 13, 1972, as acute schizophrenia episode, and that the same diagnosis was made almost a year later, during her hospitalization from December 7, 1972, to January 2, 1973, after appellant apparently had stopped taking her prescribed medication. *Id.* 65.

In sum, then, we conclude that the findings of mental disability and the alleged instances of disruptive behavior are supported by sufficient evidence such that we may discern a rational basis for the Commission's holding that the agency had adequately established that the observed deficiencies in appellant's behavior at work stemmed from that diagnosed disability. As the AEO explained, *id.* 21, the agency's letter directing appellant to undergo the fitness-for-duty examination set forth the specific instances of unsatisfactory behavior, *see* note 4 *supra,* upon which the agency

---

**25.** These figures, broken down as follows for the 1971, 1972, and 1973 leave years, do lend support to the Bureau's conclusion that treatment had had no lasting effect.

1971 Leave Year from 6/7/71 through 1/8/72 10–1/8 days—8 occasions

1972 Leave Year from 1/9/72 through 1/6/73 67–6/8 days—37 occasions

1973 Leave Year from 1/7/73 through 5/21/73 when placed off duty 15 days—27 occasions

Record 61. Whether appellant in fact would have become employable with continued treatment, as Dr. Bernet opined, is not germane to the rationality *vel non* of the agency's decision that she was not *then* fit for duty. It is quite germane, however, in assessing the feasibility of placing appellant on extended leave-without-pay status. *See* text *infra* at —— of 184 U.S. App.D.C., at 282 of 566 F.2d.

later relied in instituting the removal proceedings. With this information, appellant's job description, and other personnel history before him, *see id.* 102–05, Dr. Valle psychiatrically concluded that she was not fit for duty at that time. This medical conclusion was incorporated into the notice of proposed adverse action, and by so doing the Bureau satisfied any nexus requirement. *See generally* 5 C.F.R. § 339.101 (1974); *Salter v. United States,* 412 F.2d 874, 875, 188 Ct.Cl. 524 (1969) ("If the medical report [fitness-for-duty examination] had established that plaintiff was physically or mentally unfit for his position, he could have been removed or demoted therefrom for this reason.") At least in this case, any other conclusion would be unduly formalistic.

### B

Appellant also argues quite forcefully that the communication between the AEO and Dr. Eck, characterized as an ex parte contact, amounted to a prejudicial violation of administrative due process. *See* Appellant's Brief at 26–30; Appellant's Reply Brief at 1–4. We agree, but only in part.

At the outset, it will be worthwhile to clarify what we consider *not* to be involved in this particular case. For one, we do not confront here, as the Court of Claims did in *Camero v. United States,* 375 F.2d 777, 779–81, 179 Ct.Cl. 520 (1967) and *Jarett v. United States,* 451 F.2d 623, 628–29, 195 Ct.Cl. 320 (1971) (where decisions adverse to government employees were reversed), ex parte communications of the employing agency concerning the merits of the case addressed to those responsible for decision in proceedings required by regulations to be adversarial evidentiary hearings. *See, e. g., Gayer v. Schlesinger, supra,* 490 F.2d at 747; *Brown v. United States,* 377 F.Supp. 530, 539 (N.D.Tex.1974) (procedural due process violated where hearing examiner on several occasions discussed case with "prosecutor" for agency prior to agency hearing). Nor is ours a case where the relevant factors and contentions in a controversy were not known to all of the parties. *Cf. Moore-McCormack Lines, Inc. v. United States,* 413 F.2d 568, 188 Ct.Cl. 644 (1969). Moreover, Dr. Eck was not allied with an adversary, and, absent some reason to believe otherwise, we should presume that he had a neutral stake in the outcome of the appeal.

■ Were it otherwise, this might be a different case, for, as a general rule, ex parte communications by an adversary party to a decision-maker in an adjudicatory proceeding are prohibited as fundamentally at variance with our conceptions of due process. *See Sangamon Valley Television Corp. v. United States,* 106 U.S.App.D.C. 30, 269 F.2d 221 (1959); Administrative Procedure Act § 5(c), 5 U.S.C. § 554(d) (1970). In short, whatever else it may have been, this alleged ex parte communication was not an unsolicited, self-serving contact initiated by an interested party to add to its factual evidence or to proffer further justification for its actions after the record should have been closed.

On the other hand, however, the AEO's solicitation of an additional medical opinion is hardly analogous to "an assembling of the files and a placing of the case in proper posture for the hearing" which the Court of Claims found acceptable in *Korman v. United States,* 462 F.2d 1382, 1388, 199 Ct.Cl. 78 (1972), or, as the Government now urges, to the appropriate use of assistants underwritten by the Supreme Court in *Morgan v. United States,* 298 U.S. 468, 478–82, 56 S.Ct. 906, 80 L.Ed. 1288 (1936), and by this court in *Braniff Airways, Inc. v. CAB,* 126 U.S. App.D.C. 399, 407, 379 F.2d 453, 461 (1967). What occurred in this case must be viewed as essentially the introduction of further medical opinion evidence into the record, and not simply the obtaining of assistance in evaluating existing record evidence.

■ The introduction of such evidence into the record upon which the appellate decisions would be based without an opportunity for the parties to comment thereon appears to conflict with certain procedural

requirements by which the Commission is bound in adjudicating appeals. During the pertinent period, the Commission's own rules governing the appellate review of adverse personnel actions, for instance, did provide, with one exception not applicable here, that

> [a] representative of the Commission shall discuss *all* relevant representations and evidence with both parties and make the representations and evidence available to them for review.[26]

5 C.F.R. § 772.304(c) (1974) (emphasis added), *presently amended and codified at id.* § 772.305(b) (1977). *See also id.* § 772.308 (1977) (a new provision, not applicable herein, concerning the closing of the record). Furthermore, section 7701 of title 5 [27] provides that the Commission shall make its decision "after investigation and consideration of the *evidence submitted* . . . ." 5 U.S.C. § 7701 (1970) (emphasis added). Though not entirely clear, we believe that this statutory language contemplates that the Commission's decision will be based on its review of an administrative record which all parties have had an opportunity to review and comment upon. This certainly appears consistent with the Commission's professed practice, for the Chief of the AEO specifically stated that if appellant did not desire a hearing, which she did not, *see* Record 26, "his [*sic*] case will be adjudicated on the basis of the documents of record." Record 120. *See also id.* 32.

It is thus our considered opinion that, even though Dr. Eck's opinion was merely an additional medical evaluation of record evidence upon which appellant had already had a full and fair opportunity to comment, it was also considerably more— being evidence of the type that went to the essence of the validity of the agency's decision in this case—and therefore appellant should have been afforded an opportunity to review and comment upon it as provided for by Commission regulation.[28] While such a practice will inevitably introduce some delay in deciding an appeal, that cost will, at the least, be more than counterbalanced by the benefits derived from the appearance of a fairer adjudication of the merits. Furthermore, the better practice will be to remand the case to the hearing authority to reopen the proceedings in those cases where the Commission is uncertain about the sufficiency of the evidence one way or the other.

Although reception and consideration of this undisclosed additional medical opinion by the AEO constituted procedural error, we hold that such error was not prejudicial and does not warrant reversal of the summary judgment, since in effect the evidence thusly generated was merely cumulative. *See Dozier v. United States,* 473 F.2d 866, 868 (5th Cir. 1973); Administrative Procedure Act § 10(e), 5 U.S.C. § 706 (1970) (rule of prejudicial error).[29] *See also Nelms v. United States,* 167 Ct.Cl.

---

**26.** Pursuant to this regulation, appellant and her employing agency were given an opportunity to review the contents of the so-called "appeals file." *See* Record 31–32. As it turns out, however, appellant did not see all of the evidence in her case, *see id.* 32 ("[y]ou are requested to appear . . . to review the evidence in [the] case . . . .") until the AEO handed down its decision which quoted Dr. Eck's medical opinion.

**27.** Section 7701 codified those provisions of section 14 of the Veteran's Preference Act of 1944, as amended, *codified at* 5 U.S.C. §§ 7511, 7512, 7701 (1970 & Supp. V 1975), which established the procedures to be followed when an employee appeals an adverse agency action to the Commission. Executive Order 10,988 of January 17, 1962, extended the appeal rights of

the Veteran's Preference Act to all competitive civil service employees. Exec. Order No. 10,-988, § 14, 3 C.F.R. 521, 527 (1959–1963 Comp.).

**28.** We do not reach the constitutional arguments on this issue pressed upon us by appellant.

**29.** The Administrative Procedure Act requires that in passing upon agency action "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706 (1970). Though a reviewing court thus will not nullify an agency's decision because of error unless it is prejudicial, *see Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971), we neverthe-

423 (1964), *cert. denied*, 381 U.S. 943, 85 S.Ct. 1781, 14 L.Ed.2d 706 (1965). Appellant's claim of prejudice is founded primarily on her assertion that Dr. Eck's "ex parte" medical opinion supplied the essential, *and hitherto lacking*, nexus statement establishing the causal relationship between the diagnosed mental disability and the deficiencies identified as justificatory grounds for removal. We view the matter differently.

The AEO expressly stated in its decision that it found the agency had established the required nexus "through the two letters" (fitness-for-duty examination and proposed adverse action letters). It then explained:

> *Nonetheless, in order to obtain further evaluation of the medical evidence* on which the agency had relied in proposing [appellant's] removal . . . we submitted the entire case file to the Medical Division . . . Bureau of Retirement, Insurance and Occupational Health (BRIOH), U. S. Civil Service Commission for review . . . ."

Record 21. It is quite clear from the first statement, the substance of which we have in effect found to be reasonable, that the AEO would have concluded that the necessary link had been established independent of this supplemental evidence. Where an alleged error in all likelihood would not have affected the result, its occurrence can not have been prejudicial. *See Chrysler Corp. v. FTC*, No. 76–1586, 182 U.S.App. D.C. 359 at 364–365, 561 F.2d 357, at 362–363 (1977). *See also Smith v. Dulles*, 99 U.S.App.D.C. 6, 9, 236 F.2d 739, 742, *cert. denied*, 352 U.S. 955, 77 S.Ct. 329, 1 L.Ed.2d 244 (1956). We are also convinced that the impartiality of the AEO, and, more importantly, of the ARB which subsequently took administrative notice of the additional

medical opinion, was not impaired and that, expressly proceeding out of an abundance of caution rather than indecision, the fundamental fairness of appellant's appeal to the Commission was not vitiated by the AEO's action. *Cf. United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977) ("due process . . . must consider the reasons for the [alleged error] as well as the prejudice to the [party alleging it]").

Despite our holding that a reversal is not compelled on this ground, we add a few words of caution. An employee must be afforded as full and fair an opportunity to make an informed and effective defense as the applicable law permits, not only before the agency, but also before the Commission on appeal. If the right of appeal to the Commission and the procedural safeguards created to assure its impartiality and accuracy of decision are to be something more than a costly facade—a Potemkin village—thrown up to conceal a foregone conclusion, the aggrieved party especially must be afforded a chance to review and comment upon the evidence that is to be considered by those responsible for deciding the appeal. We, of course, do not intend to hamper the Commission with the fear that the validity of its decisions will be jeopardized whenever it attempts better to inform its deliberative process and to assure a correct result. When, however, for whatever reason, it seeks to obtain further evidence against which to adjudge the validity of the agency's adverse personnel decision, both the Commission's own regulations and fairness to the individual employee require that such evidence be placed in the record for all the parties to see, and, should they choose, make their views known.

### C

We find appellant's final contention more compelling than her others. In this, she

---

less have been cautious in applying the doctrine of harmless administrative error when basic procedural rights have been implicated. *See Yiu Fong Cheung v. Immigration and Naturalization Service*, 135 U.S.App.D.C. 244, 248, 418 F.2d 460, 464 (1969) (refusal to apply doctrine, though deportability clear, in face of extensive violations of agency deportation regula-

tions promulgated for obvious benefit of prospective deportees). We heed that caution in this case, but believe the agency's action challenged here can scarcely be characterized as impinging upon so basic a right to procedural due process as that confronted by the court in *Yiu Fong Cheung*.

argues that, even assuming she labored under a mental handicap, the Government failed to comply with its own regulations by not making "every reasonable effort" to reassign her before seeking her removal for such disability. This failure, she asserts, rendered the Bureau's personnel action void as procedurally defective.

The source of this particular claim is to be found in certain provisions of the *Federal Personnel Manual*—the Civil Service Commission's official vehicle for issuing its personnel regulations, guidelines, and policies to other federal agencies—which seek to guide employing agencies in striking a reasonable balance between the legislative and executive branch policies of utilizing the medically handicapped,[30] on the one hand, and, on the other, the practical necessity of assuring the safe and efficient achievement of the agency's assigned mission. To this end, the *Manual* provides as follows:

> When an employee no longer can perform the duties of his or her position efficiently and safely because of his physical or mental condition, the agency may separate him on the basis of disability. . . . In view, however, of the policy of the executive branch on utilization of employees who are handicapped or who develop handicaps (see subchapters 4 and 8 of chapter 306) every reasonable effort *should be* made to reassign the employee to duties he can perform efficiently and safely . . . . Specifically, the following alternatives *should be* considered:
>
> (1) A liberal grant of leave without pay when paid leave is exhausted and the disability is of a remediable nature and likely to respond to treatment and hospitalization. Many mental and emotional disorders, formerly considered completely disabling, now fall in this category in view of the dramatic medical advance made in treatment and rehabilitation of these conditions in recent years.

339 FPM 1–3(b)(1) (Mar. 1972) (emphasis added).

From our review of the administrative record, we are left with the distinct impression that in fact no real effort was ever made to reassign appellant to other duties in which she might have performed more satisfactorily. For instance, the Chief of ORTS, where appellant worked, testified that he arranged to have her detailed on a temporary basis to the Bureau's Technical Services Division "where there was need of a clerk-typist for a period of one week." Tr. 185. When asked why appellant had been returned after only one week, this witness offered the following testimony which underscores the rather feckless efforts to reassign appellant:

Q. Why did you have her transferred?

A. Well, I thought she would be less potential complex [*sic*] and so on. If it was true there was any possible friction between herself and [a co-worker].

Q. Did you feel that this might be a possibility, that some of these things were personality differences between [the co-worker]?

A. I thought this might be a possibility, but it was the only move that I could make to try to alleviate the situation and it wasn't a successful one. I think the following week, ORI, located someone for this particular vacancy. However, it was done at my specific request. As I recall, the people in Technical Services Division weren't particularly happy about the situation. I had her detailed there, I had it done. They would rather have had someone else or didn't feel her work was entirely satisfactory, but there was no incidence involved there from the mental condition or anything like that. I didn't hear any comments of that sort from . . . the Superintendent of the Division at the time . . . .

Q. Did he give you any reason; what was the reason why she came back if, you know what the reason was?

\* \* \* \* \* \*

A. I think the precipitating reason was a person had been located to fill the job. Otherwise, I would perhaps have insisted

---

**30.** *See* note 32 *infra*.

that they try keeping her a bit longer, to see if that would work, because there was a lot of unhappiness or potential friction to develop because the situation had gone on for some months.

Tr. 199–201.

The head of another Bureau office for whom appellant had done considerable work also testified that he had informally suggested that she be reassigned to him in light of the apparent problems in her present job. Tr. 249. He considered their general relations to be excellent and her work to be most satisfactory at times, though not so at other times. *Id.* 251–53. Notwithstanding the need for another clerk-typist in this office, appellant was not reassigned there ostensibly because the Assistant Chief of ORTS believed that there simply was not enough room to accommodate the necessary equipment. *Id.* 236. When asked whether he ever approached anyone about the possibility of a transfer, this latter official further testified that he had brought the matter up with the ORTS Chief who merely responded "[t]hat he didn't see where it would do any good, because nobody else would be willing to accept her." *Id.* 233. Without belaboring the point further, we believe it rather obvious from the foregoing that, while some consideration was given, the agency made no real effort to reassign appellant to other duties.

Without specifying exactly what they were, the Government asserts to the contrary that in fact "[e]fforts were made to locate other, suitable positions, and she was given a temporary detail." Government's Brief at 12. In fact, it never presses the point with any zest, preferring instead to shift emphasis from the extent of efforts expended to the feasibility of reassignment. In this regard, the Government refers us to the AEO's conclusion which, it correctly maintains, we should not ignore by merely substituting our own judgment.

> [T]he appellant was placed on one detail and some effort was made to locate other positions for her. It was within the agency's prerogative to make the decision that after receiving the report from her fitness-for-duty examination which stated that she was not fit for duty, *that reassignment was not a feasible alternative.* Medical advice and opinion were obtained throughout the proceedings leading to appellant's removal. We find no impropriety in the agency's accepting the medically based decision that removal rather than reassignment was the appropriate and best course of action for all concerned.

Record 20 (emphasis added); Government's Brief at 12–13. This reasoning, however, plays fast and loose with the facts, for in actuality, apart from Dr. Valle's terse, hand-scrawled "not fit for duty at this time", there was no medically-based decision whatsoever that "removal rather than reassignment was the appropriate course of action for all concerned . . .," or that "[a] liberal grant of leave without pay" would have been futile.

Whether what appears to have been inadequate affirmative reassignment effort or consideration of the liberal leave-without-pay option entitles appellant to the relief she seeks is quite a different matter, however. It is, of course, well-established that an agency must abide by its own regulations in effecting the removal of one of its employees. *See Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Mazaleski v. Treusdell,* No. 75–1817, 183 U.S.App.D.C. 182, 562 F.2d 701 (1977). If the *Manual* provision to which appellant now refers us is indeed a binding regulation and if the agency has failed to comply with its mandate to the prejudice of its employee, then an essential predicate to a valid removal will have been wanting. We must thus address the question whether the above-quoted provision in the *Manual* is a regulation or something less which does not give employees enforceable substantive rights.

We begin our analysis with the rather obvious proposition that not "every piece of paper emanating from a Department or Independent Agency is a regula-

tion." *Piccone v. United States*, 407 F.2d 866, 877, 186 Ct.Cl. 752 (1969) (Nichols, J., concurring); *see McGlasson v. United States*, 397 F.2d 303, 308–09, 184 Ct.Cl. 542 (1968); *Greenway v. United States*, 175 Ct.Cl. 350, 362 n.5, *cert. denied*, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108 (1966). It is less clear, however, to what extent provisions of the *Manual* not also published in the *Federal Register* or *Code of Federal Regulations* are mandatory rather than merely precatory. *See Piccone, supra*, 407 F.2d at 871–72 n.12. Certainly much of the *Manual* is not mandatory,[31] but some unpublished provisions may be binding if so intended by the Commission. Thus, to determine the effect of a *Manual* provision, a court must determine the Commission's intent in authoring it, as ascertained by an

examination of the provision's language, its context, and any available extrinsic evidence. This inquiry is not well suited to an appellate court, however, and consequently we must remand the case to the district court for resolution of this point. We of course recognize that the provision in question employs the directory "should be" rather than the mandatory "shall" or "must", but this should not be automatically determinative of the issue. *Cf. Thompson v. Clifford*, 132 U.S.App.D.C. 351, 355, 356, 408 F.2d 154, 158–59 (1968). Particularly in this instance, this superficial indicium of intent should be weighed against the rather strong expressions of congressional, executive, and Commission policy favoring a liberal employment of the mentally and physically handicapped [32] and any evidence that the

---

**31.** For instance, *see* 171 FPM 2–1 (Jan. 1972), which explains:

> The Federal Personnel Manual system is the official medium of the Commission for issuing its personnel regulations and instructions, policy statements, and related material on Government-wide personnel programs, to other agencies. To make the system a more convenient reference tool, it also includes a certain amount of information about the Commission's organization and procedures, and of material issued by bodies other than the Commission, such as acts of Congress, Executive orders, opinions of the Attorney General, and decisions of the Comptroller General.

**32.** The statutory source of the *Manual* provision in question is to be found in a 1948 statute in which Congress conferred authority upon the President to establish regulations aimed at minimizing discrimination against physically-handicapped federal employees. Act of June 10, 1948, 62 Stat. 351. The legislative history of this enactment emphasizes what is clear from the literal language of the statute itself: that Congress intended "to eliminate or minimize discrimination solely from the physical condition of any applicant," but only insofar as the physical handicap did not materially interfere with the efficient performance of the handicapped employee's duties. S.Rep.No.1222, 80th Cong., 2d Sess. 1–2 (1948); *accord*, H.Rep. No.1092, 80th Cong., 1st Sess. (1947).

The terms of the 1948 Act were rewritten in 1966, Act of Sept. 6, 1966, Pub.L. No. 89–544, *codified at* 5 U.S.C. 7153 (1970), as a general prohibition of discrimination because of physical handicap without reference to the specific personnel actions previously enumerated in the 1948 Act. The relevant House and Senate Reports evidence no further legislative intent on

the matter. The provision as it presently exists provides as follows:

> The President may prescribe rules which shall prohibit, as nearly as conditions of good administration warrant, discrimination because of physical handicap in an Executive agency or in the competitive service with respect to a position the duties of which, in the opinion of the Civil Service Commission, can be performed efficiently by an individual with a physical handicap, except that the employment may not endanger the health or safety of the individual or others.

*Id.* The President is empowered to grant exceptions from the provisions of section 7153 by *id.* § 3302(2), but so far as our research discloses, he has not done so to this time.

Pursuant to this grant of statutory authority, as delegated to it, the Civil Service Commission promulgated regulations in 1969, 34 Fed.Reg. 5367 (1969), which prohibit an agency from taking

> an adverse action against an employee covered by Part 752 . . . for physical handicap with respect to any position the duties of which may be efficiently performed by a person with the physical handicap.

5 C.F.R. § 713.401(b)(3) (1974); *accord, id.* § 752.104(c). In the same year, 1969, the Commission gave more particularized vigor to section 7153's mandate and the policies expressed in various Presidential statements, *see* 306 FPM 1–3(2) (July 1969), on employment and retention of the handicapped when it established its Selective Placement Programs. FPM ch. 306. Under this program, agency management is charged with various responsibilities including generally

> [a]dvising and assisting employees who are handicapped or who develop handicaps, es-

Commission or the agency have by their past actions created a "common law" of reassignment or of granting leave-without-pay. We also note that so far neither the Bureau, AEO, ARB, previously, nor the Commission in this litigation, has claimed that the subject provision is *not* a binding regulation.

 If on remand it should be found that the *Manual* provision, 339 FPM 1–3(b), is mandatory rather than precatory, a further remand to the Commission will be necessary in order to adduce sufficiently complete and detailed medical evidence to permit both it and the reviewing courts to determine whether the agency abused its discretion in not reassigning appellant or placing her on extended leave-without-pay in light of the nature and chronicity of the disability as well as the availability of other suitable positions.[33] Although the *Manual's* numerous regulations, instructions, and

suggestions relating to adverse actions based on medical disabilities, taken together, are something considerably less than a paradigm of clarity, we are of the conviction that to remain consistent with the evident spirit of Commission policies towards the physically and mentally handicapped, an employing agency must exercise an *informed* discretion in determining whether reassignment or leave-without-pay are feasible alternatives to removal. An informed exercise of discretion, we think, necessarily contemplates a comprehensive and detailed report of psychiatric examination so as adequately to inform the agency as to the scope of the medical problem. We note that the *Manual* specifically requires:

> If it is determined that removal (rather than reassignment or retirement) is in order, the agency should obtain *a complete and detailed report of physical examination* without cost to the employee.

> pecially job-incurred or job-related conditions and making every effort to preclude either disability retirement or separation for disability when continued employment is feasible and not detrimental to either the employee or the Government.

306 FPM 3–2(d)(2)(c) (July 1969). Consistent with congressional and executive branch policies, however, the program does not ensure job security simply because one happens to be handicapped. Although program coverage extends to physical, mental, and even social impairments, *see id.* 1–1, the *Manual* emphasizes that

> [t]he programs are designed to assist the *qualified handicapped—the physically impaired*, the emotionally restored, the mentally retarded, and the rehabilitated public offender—in obtaining and retaining employment consistent with their level of skills and abilities and their capacity for safe and efficient job performance. Emphasis is on ability rather than disability and on rehabilitation efforts and present job readiness. The programs are not designed to promote the employment or retention of nonqualified, nonrehabilitated people simply because they may also be handicapped.

*Id.* 1–2. A "mentally restored" person is defined as

> one who has experienced some mental or emotional difficulty, has received professional treatment either in or outside of an institution and has been judged by competent medical authority as ready for return to his normal activities including employment.

*Id.* 5–1. In light of Dr. Bernet's medical conclusion, it appears that appellant currently falls within the terms of this program. *See* Record 86, 88. Finally, but not to exhaust the veritable plethora of other similar provisions within the *Manual's* many volumes, we note that the Commission considers itself responsible for establishing "realistic medical standards for jobs as related to actual job duties, thus permitting the handicapped to be employed in any position they can perform efficiently and safely." *Id.* 2–4(a). *See also id.* 1–4(b). *Cf. id.* 8–1, 8–2(e), 8–5 (reassignment in lieu of disability retirement).

That individual agencies have not invariably proceeded with enthusiastic vigor to achieve the goals established by Congress and the President is evident from *McNutt v. Hills*, 426 F.Supp. 990 (D.D.C.1977).

**33.** Of course, under no circumstance would an agency be required to search high and low throughout its own bureaus and the entire civil service system for a position in which a mentally or physically handicapped employee can satisfactorily perform despite his or her disabilities. *Cf. Cerrano v. Fleishman*, 339 F.2d 929, 931 (2d Cir. 1964), *cert. denied*, 382 U.S. 855, 86 S.Ct. 106, 15 L.Ed.2d 93 (1965) (no reassignment efforts necessary as a condition to a valid disability retirement). Its efforts need only be reasonable, gauged by the nature of the employee's disability and the availability of suitable alternative positions. Assuming that an agency's efforts are reviewable at all, they would be reviewable only for an abuse of discretion.

The employee should be referred for medical examination with a statement of the particular demands of the position and a statement of how the employee's performance or behavior fails to meet these demands. . . . This medical report is furnished to the Commission, upon its request, for appellate review of the removal or for other purposes.

752–1 FPM S1–3(a)(5)(b) (Feb. 1972). This so-called fitness-for-duty examination, as we have seen, is required whenever an agency "has a question about the physical or mental capacity of an employee" and seeks to justify an adverse personnel action upon such capacity. *Id.* S1–3(a)(5)(c). However, it is not administered solely as a necessary predicate to removal, for as the *Manual* itself emphasizes: "[a] fitness-for-duty medical examination will be valuable in counseling the employee and determining the feasibility of alternative actions available to the agency." 339 FPM 1–3(c) (Mar. 1972).

Although we have determined that the fitness-for-duty examination report sufficed to establish a rational basis for the Bureau's adverse action, at least when viewed in relation to the other medically-related evidence, we do not consider the simple statement, "Schizophrenia, chronic-undifferentiated, compensated. 'Not fit for duty at this time'," to be an adequate basis for an agency to assess either the feasibility

of immediate reassignment or the likely value of placing the employee on leave-without-pay status. This "diagnostic impression" is little more than an ultimate conclusion unsupported by reasons or any detailed explanation that might give some substance to it.[34] Such intractable psychiatric terminology can be of little assistance to the employing agency in evaluating the actual extent of and prognosis for an employee's psychiatric disability. As in the context of the insanity defense in a criminal trial,[35] the role of the psychiatrist in our legal system must not be perverted so that the government's actions against an individual degenerate into a "trial by label". In order for it adequately to assess the feasibility of pursuing alternative measures, such as reassignment to a less-demanding position or a liberal allowance of leave-without-pay, the agency must be informed with reasonable particularity concerning its employee's medical disability. Agency officials entrusted with personnel administration are not, on the average, in any better position to comprehend the signification of psychiatric labels—*e. g.*, schizophrenia, paranoia, neurosis, etc.—than jurymen entrusted with passing upon an insanity defense, when little else is offered by way of explanation. The terms should at least be defined, and the significance of the diagnosis and prognosis explained in reasonable detail and in a manner that relates both to the employee's current and project-

---

**34.** This case stands in stark contrast to *Scroggins v. United States, supra,* where the involuntary disability retirement of a government food service worker was predicated upon a three-page, single-spaced report based on a doctor's psychiatric examination and which included not only the diagnosis but the prognosis, the details of the psychiatric examination, the statements and responses of the patient, and the doctor's observations. *See id.* 397 F.2d at 299. *But see id.* at 300–02 (Skelton, J., concurring). We also have serious doubts about the utility of a single-visit psychiatric evaluation of only 45-minute duration. *See generally McFarland v. United States,* 517 F.2d 938, 207 Ct.Cl. 38, 48 (1975) (one doctor characterizes a one-time, 45-minute evaluation as "inherently unfair").

**35.** It should at least be quite clear that this type of terse conclusory labeling has often been condemned by this court in criminal cases where

the insanity defense has been interposed. *See, e. g., United States v. Brawner,* 153 U.S.App. D.C. 1, 38, 471 F.2d 969, 1006 (1972) (en banc) ("It is the responsibility of all concerned—expert, counsel and judge—to see to it that the jury in an insanity case is informed of the expert's underlying reasons and approach, and is not confronted with ultimate opinions on a take-it-or-leave-it basis."); *id.* at 1017–18 (Bazelon, C. J., concurring in part and dissenting in part); *Washington v. United States,* 129 U.S. App.D.C. 29, 39–40, 390 F.2d 444, 454–55 & n.30 (1967); *Heard v. United States,* 121 U.S. App.D.C. 37, 39, 348 F.2d 43, 45 (1964); *Campbell v. United States,* 113 U.S.App.D.C. 260, 277–278, 307 F.2d 597, 614–15 (1962) (Burger, J., dissenting). *Cf. Smith v. Schlesinger,* 168 U.S.App.D.C. 204, 219, 513 F.2d 462, 477 (1975) (revocation of security clearance on grounds of mental condition).

ed capacity to perform his or her work satisfactorily. *Cf. Washington v. United States*, 129 U.S.App.D.C. 29, 39, 390 F.2d 444, 454 (1967) (insanity defense context).

Our holding here is not a quixotic one, for both Dr. Bernet's prognosis, *see* Record 84–88, and Dr. Valle's testimony at the hearing, Tr. 52, as well as appellant's behavior after the fitness-for-duty examination, are good indications that, at the least, a liberal extension of leave-without-pay, coupled with continued medical treatment, may indeed have been both feasible and fruitful.

## IV

For the reasons set forth above, the judgment of the district court appealed herein is vacated and the case remanded to it for determination whether *Federal Personnel Manual* Provision 339 FPM 1–3(b)(1) (Mar. 1972) was binding on the Bureau, and if so, for further remand to the Commission to obtain a more complete psychiatric report by which the present feasibility of alternative actions may better be judged.

*So ordered.*

ROBB, Circuit Judge, concurring:

In my judgment the objective facts, independent of psychiatric opinions, required the conclusion that the appellant was not fit for continued employment in her position. I refer to the facts stated in n.25 and accompanying text of Judge Tamm's opinion, and those summarized in the Bureau's fitness-for-duty examination directive, quoted in n.4. Given those facts I cannot believe that the Bureau was required to

keep the appellant in her position indefinitely, and it is difficult to think of another position which she might have filled. Nevertheless it does seem to me that the relevant Federal Personnel Manual provision, coupled with normal compassion, should have impelled the Bureau to consider extended leave without pay as an alternative to separation. Because the Bureau did not consider any alternative I concur in the remand.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting:

My colleagues do not dispute the oft-stated principle that an administrative agency is bound by its own regulations.[1] It also is common ground among us that "[a]gency action that substantially and prejudicially violates the agency's rules cannot stand."[2] We are agreed, too, that the Civil Service Commission erred in resorting adjudicatively to Dr. Eck's conclusions on the significance of appellant's mental condition to her performance on the job and the safety of herself and her coworkers.[3] But, although I concur in much of Judge Tamm's scholarly opinion for the court, I am unable to accept the view that the Commission's blunder in that regard did not prejudice appellant. I would, therefore, remand this case, not just for an exploration into the legal and practical feasibility of appellant's reassignment within the employing agency, but more broadly for further proceedings inquiring as to whether she should be reinstated to her former position.[4]

1. See *e. g., Vitarelli v. Seaton*, 359 U.S. 535, 539, 79 S.Ct. 968, 972, 3 L.Ed.2d 1012, 1016–1017 (1959); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Gardner v. FCC*, 174 U.S.App.D.C. 234, 237, 530 F.2d 1086, 1089 (1976); *Nader v. Nuclear Regulatory Comm'n*, 168 U.S.App.D.C. 255, 261, 513 F.2d 1045, 1051 (1975).

2. *Bonita, Inc. v. Wirtz*, 125 U.S.App.D.C. 163, 167 n.4, 369 F.2d 208, 212 n.4 (1966), quoting *Sangamon Valley Television Corp. v. United States*, 106 U.S.App.D.C. 30, 33, 269 F.2d 221, 224 (1959); accord, *Union of Concerned Scientists v. AEC*, 163 U.S.App.D.C. 64, 77, 499 F.2d 1069, 1082 (1974) ("the well-settled rule [is]

that an agency's failure to follow its own regulations is fatal to the deviant action").

3. Majority Opinion (Maj.Op.) Part III(B).

4. As I view the case, as many as three steps may be needed. Each would originate before the Commission rather than the District Court. First, appellant should be provided an opportunity to combat Dr. Eck's opinion, in any event through cross-examination and, if desired, through presentation of additional evidence, especially on the question—interjected for the first time by Dr. Eck—whether appellant's mental condition renders her dangerous to co-

## I

The court finds, correctly in my view, that the Civil Service Commission relied on Dr. Eck's opinion in violation of pertinent procedural rules, by which the Commission is firmly bound.[5] Indeed, this circumvention of the hearing process, and of its attendant opportunities to review and comment on the evidence and to cross-examine witnesses,[6] raises serious questions of procedural due process.[7] Where I must differ with the court, however, is as to whether the error was nonprejudicial, particularly on the court's theory that as evidence Dr. Eck's statement was "merely cumulative."[8]

Neither the Commission nor the court attempts to demonstrate that appellant could not possibly have successfully attacked or at least mitigated Dr. Eck's opinion had she been given the chance to do so.[9] The cross-examination of Dr. Valle by appellant's counsel, and the introduction of an article from a psychiatric journal that undercut the employing agency's under-

workers. Second, assuming that appellant *makes some substantial responsive showing,* the Commission should reconsider appellant's removal from her former position at the Bureau of Engraving and Printing, and determine whether she should be reinstated therein. Third, if the latter course is not pursued, the Commission should proceed to the issue of the Bureau's responsibility to reassign her as one whose psychiatric problem interferes with the performance of the duties previously entrusted to her. If the Commission should decide that the employing agency is not required to seek reassignment, or that appellant is not reassignable, appellant would then have the opportunity to show in the District Court that the relevant Federal Personnel Manual provisions are binding and require her reassignment. Although the question of the binding effect of the provisions—involving determinations of whether the "rules" were of public knowledge, were intended for the benefit of federal employees as well as employers, and were intended as mandatory by the agency, see *American Farm Lines v. Black Ball Freight Serv.,* 397 U.S. 532, 538–539, 90 S.Ct. 1288, 1292–1293, 25 L.Ed.2d 547, 552–553 (1970) (ICC not bound by rules promulgated primarily for Commission's assistance and not to confer procedural benefits on individuals); *Yellin v. United States,* 374 U.S. 109, 114–117, 83 S.Ct. 1828, 1832–1834, 10 L.Ed.2d 778, 783–785 (1963) (committee bound by its rules where "throughout the rules, the dominant theme is definition of the witness' rights and privileges"); *United States v. Leahey,* 434 F.2d 7, 11 (1st Cir.1970) (two intersecting factors are "a general guideline, deliberately devised, aiming at accomplishing uniform conduct of officials" and "an equally deliberate public announcement"); see also *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270, 294 (1974) (Bureau of Indian Affairs is bound by its "Manual" even though "the internal procedures are possibly more rigorous than otherwise would by required")—is at least as appropriate for determination in the first instance by the District Court as by the Commission, it would be more expedient for the Commission to consider the issue of reassignment along with the other issues in which I

believe remand to the Commission is essential. As the court points out, if the regulations are binding, it is the Commission that should initially determine whether the employing agency properly failed to reassign Ms. Doe. It thus seems sensible to allow the Commission a chance to determine the binding effect and application of the Manual in the event that its analysis of the other issues leads it to conclude that appellant was unfit for her previous job.

**5.** Maj.Op., 184 U.S.App.D.C. at —— & nn.9–10, 566 F.2d at 270 & nn.9–10.

**6.** See 5 C.F.R. § 771.210 (1974). The regulations allow the parties to cross-examine the witnesses. *Id.* § 771.210(f). See also 2 Recommendations and Reports of the Administrative Conference of the United States 77 (Recommendation 72–8) ("[e]xpert professional advice on the facts or disposition of a case . . . should only be received on the record, subject to the right of both parties to respond").

**7.** *Ralpho v. Bell,* 186 U.S.App.D.C. —— at ——, 569 F.2d 607 at 628 (1977) ("[a]n opportunity to meet and rebut evidence utilized by an administrative agency has long been regarded as a primary requisite of due process"). In *Ralpho,* we described two earlier Supreme Court opinions as holding that "reliance on extra-record factual evidence without opportunity to the parties to inspect and address [is] a denial of due process." *Id.,* 186 U.S.App.D.C. at —— n.160, 569 F.2d at 628 n.160 (discussing *Morgan v. United States,* 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938) and *Ohio Bell Tel. Co. v. Public Utils. Comm'n,* 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937)).

**8.** Maj.Op., 184 U.S.App.D.C. at —— & n.29, 566 F.2d at 277 & n.29.

**9.** Compare *Chrysler Corp. v. FTC,* No. 76–1586, 182 U.S.App.D.C. 359, 364–365, 561 F.2d 357, 362–363 (1977) (no prejudice where improperly considered supplemental evidence was indisputably accurate).

standing of Dr. Valle's conclusions, indicate that an opportunity to challenge Dr. Eck's "impression" would not necessarily have been futile.[10] Implicitly acknowledging this, the court adopts the analytical technique of attempting to determine whether the Commission would have reached the same result had it not solicited and received Dr. Eck's opinion.

Though, indubitably, some procedural improprieties can readily and truly be labeled "harmless," [11] only in relatively clear cases should we undertake to do so.[12] Generally, agency action makes no claim on judicial affirmance while the consequences of material error in the agency's findings remain a matter of substantial doubt.[13] Additionally, as we have had occasion to admonish, "[t]he doctrine [of harmless error] must be used gingerly, if at all, when basic procedural rights are at stake." [14] To be sure, as the court aptly points out, we must focus on the methodology of agency decisionmaking and not substitute our own decisionmaking skills for those of the agency.[15] And the corollary of that principle is that when a procedural mistake is uncovered we normally should return the litigation—corrected to remove the defect—to the administrative process rather than attempt to decide the merits ourselves.[16] When a procedural reg

10. See Transcript of Hearing Before Appeals Examiner, Bureau of Engraving and Printing at 15–56, 66–76 (Sept. 11, 1973). Nor is this a case in which appellant was given a post-hearing opportunity to review and comment upon the evidence in question. Thus, we are not called upon to determine whether such an opportunity would render the error harmless and comport with the regulations and the Constitution.

11. See, e. g., Kerner v. Celebrezze, 340 F.2d 736, 740 (2d Cir.), cert. denied, 382 U.S. 861, 86 S.Ct. 121, 15 L.Ed.2d 99 (1965).

12. See cases cited infra notes 13–14.

13. Section 10(e) of the Administrative Procedure Act specifies that on judicial review of agency action "due account shall be taken of the rule of prejudical error." 5 U.S.C. § 706 (1970). We have consistently measured the prejudicial effect of erroneous administrative findings and inferences by ascertaining whether there is "substantial doubt" that the ultimate finding would nonetheless have been the same, Tashof v. FTC, 141 U.S.App.D.C. 274, 280, 437 F.2d 707, 713 (1970); NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 139 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953); Denton v. Secretary of Air Force, 483 F.2d 21, 28 (9th Cir.1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974); see also Fairmont Foods Co. v. Hardin, 143 U.S. App.D.C. 40, 48, 442 F.2d 762, 770 (1971); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 412, 379 F.2d 453, 466 (1967), a yardstick approximating that traditionally utilized on appeals from lower court civil proceedings. See Boston & A. R. R. v. O'Reilly, 158 U.S. 334, 337, 15 S.Ct. 830, 831, 39 L.Ed. 1006, 1008 (1895) (likelihood of same result must be beyond doubt); Chichester Chem. Co. v. United States, 60 App.D.C. 134, 137, 49 F.2d 516, 519 (1931) (same result in absence of error must be certain). Because "the rule of prejudical error" has essentially the same function on review of either type of litigation, compare Kerner v. Celebrezze, supra note 11, 340 F.2d at 736; see generally, Braniff Airways, Inc. v. CAB, supra, 126 U.S.App.D.C. at 412–413, 379 F.2d at 465– 466, I perceive no good reason why the impact of general administrative error of any kind should not be tested by the same "substantial-doubt" standard. Of course, error involving the use of improper procedures calls forth even more rigorous application of the standard for the reasons I have discussed in text. See text infra at notes 15–17; Braniff Airways, Inc. v. CAB, supra, 126 U.S.App.D.C. at 412–413, 379 F.2d at 465–466. Indeed, some administrative procedures might be so fundamental to the achievement of a fair and accurate decision that a denial of or defect in the procedure will always give rise to a substantial doubt. See National Capital Airlines, Inc. v. CAB, 136 U.S. App.D.C. 86, 94–95 n.12, 419 F.2d 668, 676–677 n.12 (1969), cert. denied, 398 U.S. 908, 90 S.Ct. 1693, 26 L.Ed.2d 68 (1970). See also United States v. Heffner, 420 F.2d 809, 813 (4th Cir. 1970).

14. Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393 n.16, 444 F.2d 841, 851 n.16 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971) (citing Yiu Fong Cheung v. INS, 135 U.S.App.D.C. 244, 248, 418 F.2d 460, 464 (1969)).

15. Maj.Op., 184 U.S.App.D.C. at —— & nn.13– 14, 566 F.2d at 271 & nn.13–14.

16. See Massachusetts Trustees of E. Gas & Fuel Assocs. v. United States, 377 U.S. 235, 247–248, 84 S.Ct. 1236, 1244–1245, 12 L.Ed.2d 268, 277 (1964) (remand more appropriate when improper procedure employed or relevant criteria misemployed than when other type of administrative mistake made); cf. Powhatan Mining Co. v. Ickes, 118 F.2d 105, 110 (6th

ulation ignored by the agency is designed to produce a fairer and more accurate decision, we should—precisely for that reason—hesitate to assume that the defective procedure equally achieved that goal. To be balanced against agency error, of course, is the desirability of avoiding unnecessary expenditures of administrative resources and efforts. But this consideration weighs heavily only if it is clear that the outcome in the agency would be the same the second time around.[17]

## II

This, by my lights, is not a clear case. Dr. Eck's opinion aside, evidence of appellant's unfitness for continued duty at her assigned post is by no means overwhelming, even when measured by the test of arbitrariness and capriciousness applied by the court.[18] Although that standard of review is less demanding than the substantial-evidence test utilized in this circuit and others in reviewing agency adjudicative hearings during at least the last decade,[19] I complete-

Cir.1941) ("a reviewing court cannot know what a full hearing might have shown and for that reason is not free to speculate as to the prejudice involved").

**17.** See note 13 *supra* and accompanying text.

**18.** See Maj.Op., 184 U.S.App.D.C. at —— & n.15, 566 F.2d at 271–272 & n.15.

**19.** *E. g., Efthemes v. Comm'rs,* 168 U.S.App.D.C. 286, 288, 514 F.2d 182, 184 (1975); *Polcover v. Secretary of Treasury,* 155 U.S.App.D.C. 338, 346, 477 F.2d 1223, 1231, *cert. denied,* 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); *Moore v. Administrator,* 155 U.S.App.D.C. 14, 17, 475 F.2d 1283, 1286 (1973); *Dabney v. Freeman,* 123 U.S.App.D.C. 166, 168, 358 F.2d 533, 535 (1965); *Pence v. Tobriner,* 121 U.S.App.D.C. 282, 283, 349 F.2d 717, 718 (1965); *Charlton v. United States,* 412 F.2d 390, 393 (3d Cir.1969), *after remand,* 462 F.2d 59 (3d Cir.1972), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 460, 34 L.Ed.2d 321 (1972); *McCourt v. Hampton,* 514 F.2d 1365, 1368 (4th Cir.1975); *Harvey v. Nunlist,* 499 F.2d 335, 336 (5th Cir. 1974); *Alsbury v. United States Postal Serv.,* 530 F.2d 852, 854 (9th Cir.), *cert. denied,* 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976); *Vigil v. Post Office Dep't,* 406 F.2d 921, 924 (10th Cir.1969); *Peters v. United States,* 408 F.2d 719, 724, 187 Ct.Cl. 63 (1969); *contra, Wroblaski v. Hampton,* 528 F.2d 852, 853 (7th Cir.1976); *cf. Twiggs v. SBA,* 541 F.2d 150, 152–153 (3d Cir.1976) (*Charlton, supra,* limited to discharges because it "represents an atypical application of the 'substantial evidence' standard").

As Professor Davis has observed, [i]n summary, the law of review of employee dismissal cases has gradually moved from almost complete unreviewability early in the century to a rather complete review in accordance with the substantial evidence rule. Language against the use of the substantial evidence rule still persists in a good many opinions but apparently the most recent holding against it is *Brown v. Zuckert,* 349 F.2d 461 (7th Cir.1965), *certiorari denied,* 382 U.S. 998, 86 S.Ct. 588, 15 L.Ed.2d 486 (1966).

The position of the *Brown* case seems destined to give way. K. Davis, Administrative Law Treatise § 29.07, at 1011 (1970 Supp.). The Commission's brief recognizes that, at least in this circuit, judicial review in cases such as this calls for a decision as to whether the challenged action is supported by substantial evidence. Brief for Appellees at 11.

The "common law" of judicial review of administrative action indicates that where "the proper procedure is quasi-adjudicative[,] . . . the proper standard of review is substantial evidence on the record as a whole." See *Safir v. Kreps,* 179 U.S.App.D.C. 261, 269, 551 F.2d 447, 455 (1977). The court rejects that test in favor of the arbitrary-and-capricious standard for this case on the basis of § 10(e) of the Administrative Procedure Act, which provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action . . . unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute". 5 U.S.C. § 706 (1970). Sections 556 and 557 establish certain requirements for hearings provided by §§ 553 and 554, and § 554, which requires hearings before certain adjudications, exempts actions involving "the selection or tenure of an employee." Thus the question whether employee-discharge litigation is intercepted.

Notwithstanding the language last quoted, we review here "the record of an agency hearing provided by statute". Although the Lloyd-La Follette Act does not expressly mandate a hearing, it does authorize one, and in this case one was "provided." See 5 U.S.C. § 7501 (1970) ("[e]xamination of witnesses, trial, or hearing is not required but may be provided in the discretion of the individual directing the removal or suspension without pay"). In fact, Commission regulations, promulgated pursuant to statutory authority, expressly require a hearing. 5 C.F.R. § 771.307(b) (1977) and, moreover, § 7501 itself implicitly does also. In *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), at least six of the Justices concluded that, because § 7501 creates a

ly agree with my colleagues [20] that judicial descriptions of the review process in cases such as this are not nearly as important as what the court actually does.[21] What should be kept in mind, regardless of the standard we purport to use, is that while we will not substitute our view of the evidence for that of the agency, the evidence upon which the agency relies must be such that it has, to use the court's phrase, exercised "an *informed* discretion." [22]

Unlike my colleagues, I am not at all sure that the evidence in this case supports an informed exercise of discretion in the direction chosen by the employing agency and later by the Commission. The court feels that there was a nexus between Dr. Valle's medical conclusions and "observed deficien-

cies in work performance or employee behavior." [23] The court seems to assume, moreover, that since appellant was sent for examination by Dr. Valle because of her "work performance or employee behavior," his conclusions were causally related to that behavior.[24] Yet the court substantially undercuts Dr. Valle's diagnosis—rightly, I think—noting "serious doubts about the utility of a single-visit psychiatric evaluation of only 45-minutes duration." [25] Later the court declares that Dr. Valle's "diagnostic impression" was not

> an adequate basis for an agency to assess either the feasibility of immediate reassignment or the likely value of placing the employee on leave-without-pay status. . . . Such intractable psychiat-

---

"property" interest in continued employment absent cause, some sort of notice and hearing is constitutionally required. *Id.* at 166, 94 S.Ct. at 1650, 40 L.Ed.2d at 40 (Powell, J., with Blackmun, J., concurring) ("[t]he federal statute guaranteeing appellee continued employment absent 'cause' for discharge conferred on him a legitimate claim of entitlement which constituted a 'property' interest under the Fifth Amendment. Thus termination of his employment requires notice and a hearing"); *id.* at 185–186, 94 S.Ct. at 1660, 40 L.Ed.2d at 51 (White, J., concurring in part and dissenting in part) ("I conclude, therefore, that as a matter of due process, a hearing must be held at some time before a competitive civil service employee may be finally terminated for misconduct. Here, the Constitution and the Lloyd-La Follette Act converge, because a full trial-type hearing is provided by statute before termination becomes final, by way of appeal either through [the employing agency], the Civil Service Commission, or both"); *id.* at 226–227, 94 S.Ct. at 1680, 40 L.Ed.2d at 74–75 (Marshall, J., with Douglas & Brennan, JJ., dissenting) (due process requires a pretermination hearing to determine adequate cause for dismissal). Thus, to pass constitutional muster, the statute cannot be read to allow the entitlement it creates to be denied without some sort of notice and hearing. In reality, then, the statute "provides" a hearing. *Cf. Reed v. Morton,* 480 F.2d 634, 643, 25 A.L.R.Fed. 787 (9th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973) (Section 554 read as applying to hearings required either by a statute or by the Constitution).

**20.** Maj.Op., 184 U.S.App.D.C. at —— n.15, 566 F.2d at 271 n.15.

**21.** *Id.* See also K. Davis, Administrative Law of the Seventies § 29.00 (1976).

**22.** Maj.Op., 184 U.S.App.D.C. at ——, 566 F.2d at 282 (emphasis in original). It has traditionally been thought that the substantial-evidence test affords "a considerably more generous judicial review than the 'arbitrary and capricious' test . . .." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 143, 87 S.Ct. 1507, 1513, 18 L.Ed.2d 681, 688 (1967). Since the labels have come to mean so little, however, clarity might be promoted were we to admit that in most cases all we are trying to do is to ensure exercise of an informed discretion. The label "substantial evidence" would then connote a determination as to whether the agency considered a sufficient amount of information, and the label "arbitrary and capricious" would signal a holding on whether the evidence considered was so one-sided that a rational decisionmaker could not have reached the result in question.

**23.** Maj.Op., 184 U.S.App.D.C. at ——, —— & nn.22–25, 566 F.2d at 274–275 & nn.22–25.

**24.** *Id.,* 184 U.S.App.D.C. at ——, 566 F.2d at 274.

**25.** *Id.,* 184 U.S.App.D.C. at —— n. 34, 566 F.2d at 283 n.34; accord, *id.,* 184 U.S.App.D.C. at ——, 566 F.2d at 274 ("we are also not much impressed with the value of the psychiatric examination administered to appellant by Dr. Valle"); *id.* at 283 ("[t]his 'diagnostic impression' is little more than an ultimate conclusion unsupported by reasons or any detailed explanation that might give some substance to it"); *id.* at 283 ("[t]he terms should at least be defined, the significance of the diagnosis and prognosis explained in reasonable detail and in a manner that relates both to the employee's current and projected capacity to perform his or her work satisfactorily").

ric terminology *can be of little assistance* to the employing agency in evaluating the actual extent of and prognosis for an employee's psychiatric disability.[26]

I agree unhesitatingly that Dr. Valle's examination is too dubious a ground for an administrative finding that appellant could not feasibly have been reassigned. But what I cannot understand is how the same examination, with its implicit suggestion of nexus, sufficiently underpins a decision that appellant was unfit for the job she then held.

In any event, the evidence of unfitness was not exceptionally strong, and, against that backdrop, I am far from convinced that the Commission's utilization of Dr. Eck's opinion was harmless. In the absence of more compelling indications one way or the other, any conclusion as to the Commission's probable outcome had it not entertained that opinion strikes me as a largely uninformed guess. Nothing in the decision of the Appeals Examining Office indicates that it requested the opinion simply "out of an abundance of caution";[27] it seems equally or more likely that the agency was unsure of the correct result and was seeking further guidance.[28] The inquiry addressed to Dr. Eck was the most critical question in the case at that time; as the court notes, his response "went to the essence of the validity of the agency's decision."[29] Furthermore, the response added a new dimension to the problem—that suicide and homicide were potential dangers if appellant remained on the job[30]—a consideration which, though not expressly advert-

ed to by the Commission, is undeniably of a nature well calculated to emotionally sway one undecided on the issue before him.

In short, I am unable to shed my very substantial doubt as to whether the Commission would have reached the same result but for its erroneous treatment of Dr. Eck's medical opinion.[31] I would not try to read the administrative decisionmaker's mind when, as here, the record does not clearly indicate what the decision would have been absent the error. Accordingly, I would remand to the agency and allow it to reconsider the matter after having provided appellant with the procedural benefits she was previously denied.

---

**26.** *Id.* at —— —— of 184 U.S.App.D.C., at 283 of 566 F.2d (emphasis supplied). The Manual instructs agencies to provide an examination of the employee, if feasible, prior to a decision to discharge. 752–1 Federal Personnel Manual § S.1–3(a)(5)(c) ("[t]o comply with the requirements of this Executive Order and law, an agency that has a question about the physical or mental capacity of an employee should have a medical report from a physician who has examined the employee"). If this procedure is to be more than a formality, it would seem that the examination must be more adequate than the court considers Dr. Valle's to be.

**27.** *Contra,* Maj.Op., 184 U.S.App.D.C., at ——, 566 F.2d at 278.

**28.** The question was directed to Dr. Eck "in order to obtain further evaluation of the medical evidence on which the agency had relied in proposing [appellant's] removal. . . ." Record at 21. This in itself strongly implies that the Appeals Examining Office was not satisfied with Dr. Valle's "impression."

**29.** Maj.Op., 184 U.S.App.D.C., at ——, 566 F.2d at 277.

**30.** Record at 23. This conclusion was quoted, but not commented upon, in the decision of the Appeals Examining Office. Maj.Op., 184 U.S. App.D.C., at ——, 566 F.2d at 276.

